UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v. Case No. 8:09-cr-585-T-24TBM

JOHN S. MORGAN

**UNITED STATES' MOTION FOR FORFEITURE MONEY JUDGMENT AND PRELIMINARY ORDER OF FORFEITURE FOR A 2003 FOUNTAIN LIGHTNING FEVER POWERBOAT**

The United States of America, by and through its counsel, respectfully moves this Court, pursuant to 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c) and Fed. R. Crim. P. 32.2(b)(2), to enter a Forfeiture Money Judgment in the amount of $10,085,375 against defendant John S. Morgan, which represents the amount of proceeds obtained as a result the conspiracy charged in Count One of the Superseding Indictment, and for which he will be jointly and severally liable with his co-conspirators Marian Morgan and Stephen Bowman.[1]

The United States also seeks a Preliminary Order of Forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and 18 U.S.C. § 982(a)(1), for a 2003, 29 foot Fountain Lightning Fever Powerboat with a 402 HP Mercruiser Engine, Hull No. FGQ29758I203, Florida Title No. 90725362, registered in the name of Marine Tech, 4638 19th Court East, Bradenton, Florida, 34202.

[1] The United States is seeking a forfeiture money judgment for the proceeds obtained as a result of the conspiracy charged in Count One of the Superseding Indictment; the proceeds of the offenses charged in Counts Two through Nineteen are included in the proceeds calculation for the conspiracy.

The order shall be final as to the defendant upon entry. *See Plea Agreement*, Doc. 139 at 10. In support, the United States submits the following memorandum of law.

**MEMORANDUM OF LAW**

## I. Procedural Background

1. A Superseding Indictment was returned charging John Morgan, Marian I. Morgan, and Stephen Bowman with conspiracy to commit wire fraud, to transport, transmit, or transfer fraudulently obtained securities and money, and to engage in monetary transactions in criminally derived property having a value of more than $10,000, in violation of 18 U.S.C. § 371. Doc. 122. Counts Two through Eight charged the defendant with wire fraud offenses, in violation of 18 U.S.C. § 1343; Counts Nine through Thirteen charged the defendant with transporting, transmitting, or transferring fraudulently obtained securities and money, in violation of 18 U.S.C.§ 2314; and Counts Fourteen through Nineteen charged the defendant with engaging in illegal monetary transactions of criminally derived property having a value of more than $10,000, in violation of 18 U.S.C. § 1957. *Id.*

2. The Superseding Indictment put the defendants on notice that, upon conviction, they would be subject to a forfeiture money judgment representing the proceeds they obtained as a result of the conspiracy charged in

Count One and the substantive fraud offenses, at least $10,085,375.[2] Doc. 122 at 20.

3. Morgan pleaded guilty to the conspiracy, in violation of 18 U.S.C. § 371, charged in Count One of the Superseding Indictment, and the money laundering offense, in violation of 18 U.S.C. § 1957, charged in Count Sixteen. Docs. 139, 141. The Court accepted Morgan's plea and adjudicated him guilty. Doc. 145.

4. In his Plea Agreement, Morgan agreed to a $10,085,375 forfeiture money judgment and to the forfeiture of the vessel described above. Doc. 139 at 9-10. Morgan further agreed that the forfeiture order would be final as to him at the time of entry. *Id.* at 10. Morgan's sentencing is scheduled for November 17, 2011. Doc. 171.

## II. <u>Applicable Law</u>

The Court's authority to order forfeiture for violations of conspiracy to defraud the United States and conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 371 and 1343, derives from 18 U.S.C. § 981(a)(1)(C). Section 981(a)(1)(C) provides for the civil forfeiture of any property, real or personal, which constitutes or is derived from proceeds traceable to any offense constituting "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7), or a

---

[2] Counts Sixteen through Nineteen of the Superseding Indictment charged the defendant with unlawful monetary transactions that involved property identified for forfeiture in the Second Bill of Particulars. Doc. 199. The United States does not intend to request the forfeiture of this property, however, as the assets have insufficient equity.

conspiracy to commit such offenses. The term “specified unlawful activity” means any act or activity constituting an offense listed in section 1961(1) of this title. Violations of 18 U.S.C. § 1343 are included in section 1961(1).[3]

Federal Rule of Criminal Procedure 32.2(b)(1) requires that as soon as practical after a verdict or guilty plea, the Court must determine what property is subject to forfeiture under the applicable statute. Where the government seeks a forfeiture money judgment, the Court makes the determination of the amount of money that the defendant will be ordered to pay. If the government seeks forfeiture of specific property, the Court must determine the requisite nexus between the property and the offense. Fed. R. Crim. P. 32.2(b)(1)(A).

Here, the government seeks a forfeiture money judgment against John Morgan in the amount of $10,085,375,[4] which represents the proceeds obtained as a result of the conspiracy charged in Count One of the Superseding Indictment. Doc. 122. The facts described below support the calculation of the forfeiture money judgment.

---

[3] Although section 981(a)(1)(C) is a civil forfeiture statute, 28 U.S.C. § 2461(c) authorizes the criminal forfeiture of any property that can be forfeited civilly using the procedures for the criminal forfeiture and disposition of property set forth in 21 U.S.C. § 853.

[4] At Marian Morgan’s trial, it was determined that the correct amount of proceeds obtained as a result of Count One was actually $10,883,767. *See Motion for Forfeiture Money Judgment* as to Marian Morgan. Doc. 315. However, since John Morgan agreed to a forfeiture money judgment in the amount of $10,085,375, the government seeks to hold him jointly and severally responsible for that amount.

## III. Facts Supporting Forfeiture Money Judgment

In his Plea Agreement, John Morgan agreed to the facts supporting his conviction on Counts One and Sixteen, the forfeiture of the 2003 Fountain Lightning Fever Powerboat with a 402 HP Mercruiser Engine, and the $10,085,375 forfeiture money judgment. *See* Doc. 139, pp. 16-26.[5]

Beginning in or about March 2005 and continuing through at least August 2009, defendants John S. Morgan and Marian I. Morgan were the principals of a Danish entity called Morgan European Holdings APS ("MEH"). John Morgan used the title of "Fund Manager" and Marian Morgan used the title of "Managing Director" of MEH. MEH was purportedly in the business of investments that were commonly called "prime bank instrument trading programs." However, John Morgan and others perpetrated a massive investment fraud scheme upon MEH victim-investors. John Morgan knew that such "trading programs," which promised extraordinarily high returns with no risk, did not exist. Indeed, John and Marian Morgan never engaged in such trading programs nor did they ever meet with a trader engaged in such programs. Doc. 139 at 17.

John and Marian Morgan, as principals of MEH, recruited individuals as team leaders, or mid-level managers, for soliciting investors in the MEH trading programs. These individuals, who were located across the United States and in

---

[5] On May 28, 2010, U.S. Magistrate Judge Thomas B. McCoun, III, issued a seizure warrant for the Powerboat and Mercruiser Engine on a finding of probable cause that they were subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), and 18 U.S.C. § 982(a)(1). Doc. 49.

Canada, would transfer information between the Morgans and the individual investors. Some of these team leaders were investors themselves. The Morgans on occasion would have direct communications with some of the investors who had been recruited by team leaders, particularly if that investor was expressing concern about the failure of the Morgans to deliver on their promises. In other cases, John and Marian Morgan dealt directly with an investor throughout that investor's relationship with MEH. *Id.*

During the period of time in which they carried out the MEH investment scheme, the Morgans maintained several bank accounts, including account xx8280 at Sun Trust Bank, accounts xx6777 and xx7678 at Fifth/Third Bank, and account xx2644 at Bank of America in Sarasota, Florida, in the name of Pro-Tap Professionals, LLC. *Id.* at 18.

In order to solicit funds for the scheme, John Morgan and others knowingly made the following false representations, orally and in writing, to potential investors:

(a) The Morgans and others had exclusive connections that would enable them to place invested funds in "trade projects" conducted by "trade banks;"

(b) The investor's principal would be pooled with the principal provided by other investors to reach a minimum placement amount for trades;

(c) A "foundation" was involved in the "trade project;"

(d) A "humanitarian project" had to be associated with the "trade project" and a portion of the gross profits had to go to the "humanitarian project;"

(e) The projected profit or return on investment ("ROI") on the "trade project" ranged between 30% and 70% per month, or between 200% and 300% per 90 to 120-day period;

(f) Withdrawals up to the full ROI could be made monthly by the investor;

(g) Full or partial ROI could be accumulated for subsequent programs;

(h) The investor's principal would be placed in one of several "funds": (i) Frankfurt Fund; (ii) Luxembourg Fund; (iii) Brussels Fund or (iv) Zurich Fund.

(i) The investor's principal was tied up for a period of time ranging from 90 days up to one year from the start date of the "trade project;"

(j) The "trade bank" or the fund manager, or both, would provide a guarantee of the investor's principal; and

(k) The investor's principal would never be put at risk and would be held in escrow for the duration of the transaction.

*Id.* at 18-19.

In order for the investors to become a part of the purported MEH trading programs, John S. Morgan and others would require them to fill out contracts specifying that their investment was a "loan" to MEH and that the investors were bound by a non-disclosure, confidentiality provision. Defendant John S. Morgan executed these contracts on behalf of MEH as "Fund Manager." *Id.* at 19.

In conjunction with providing investors with the paperwork necessary to

participate in the MEH trading programs, defendant John Morgan and others would instruct the investors to send their payments of principal, via wire transfer, to an escrow account maintained by attorney and co-conspirator Eli Heckscher. Heckscher, who had an office in Stenlose, Denmark, maintained MEH escrow account xx4550 at the Danske Bank in Denmark. He also utilized Danske Bank account xx4258 for MEH business. Very early in the scheme, before the Danske Bank accounts were established, some investors deposited funds directly into the Morgans' Bank of America ProTap account xx2644. *Id.* at 19.

For example, in or about February/March 2007, defendant John Morgan spoke about the MEH trading programs with investor Boris Dwormik of Ancaster, Ontario, and another individual by telephone. Morgan stated that he was a financier who managed funds for wealthy individuals and had connections with official at banks and exclusive arrangements to invest in notes that were used as security by the banks in short term loans. Morgan stated that the loans earned substantial interest in a short amount of time and this interest was paid as returns to investors. Moreover, Morgan explained that the investor's funds were not at risk and would be held in Heckscher's escrow account and the funds could be returned at any time. In reliance upon defendant John Morgan's representations, Dwormik decided to invest. He signed a contract with MEH and wired $100,000 to Heckscher's escrow account on or about April 3, 2007. On April 11, 2007, John Morgan and others caused $500,000 of investor funds to be transferred

from the Heckscher escrow account to the Morgans' ProTap Professionals Account at Bank of America in Sarasota, Florida. *Id.* at 19-20.

Dwormik's contract indicated that in three months Dwormik would receive his principal plus $200,000. At the end of the three-month period Dwormik was given the option of rolling over his earnings and continuing his investment, which he elected to do. In July 2007, Dwormik received another signed contract showing his investment as $300,000. On August 27, 2007, the Heckscher escrow account had a balance of $0. At the completion of the contracted term for this second investment, Dwormik asked for his initial principal to be refunded. Defendant John Morgan and others refused to send him the money. Co-conspirator Marian Morgan told Dwormik the banking system was very technical and offered other excuses as well. In one subsequent call with defendant John Morgan, Dwormik offered to fly to Denmark to pick up a certified check, but Morgan told him that the issuance of checks was against banking regulations. He told Dwormik that wire transfers of principal would occur soon, by the following week. In other calls, defendant John Morgan told Dwormik the trading program was successful and his funds had grown. Dwormik never received a refund of his principal nor did he ever receive any purported ROI. *Id.* at 20-21.

One of the purposes of John Morgan and others using co-conspirator Heckscher as the manager of the escrow account was to provide investors with an additional layer of comfort in the fictitious MEH trading programs. Indeed,

during the course of the scheme, John and Marian Morgan asked attorney Eli Heckscher to draft misleading lulling communications to send to investors in an effort to mollify them and keep them from reporting the fraud to the Securities and Exchange Commission and/or law enforcement authorities. Attorney Heckscher provided these letters, many of which advised investors that their principal remained in the escrow account when in fact the Morgans and Heckscher knew that the balance in that account was *de minimis* or even zero. *Id.* at 21.

For example, beginning in February 2006 co-conspirator Stephen Bowman caused wire transfers of approximately $4.5 million received from individuals for investment in the MEH trading programs to be sent to Heckscher for deposit in the MEH Danske Bank xx4550 account. This total included a transfer on or about May 1, 2006, of approximately $3 million from BMG account xx1337 at the Bank of the West to the Danske Bank xx4550 account. As of May 5, 2006, the Heckscher escrow account showed a balance of over $4.7 million. By June 20, 2006, the balance was down to $44,782.98. *Id.*

Instead of maintaining and safeguarding investor funds in the Danske Bank accounts as promised, defendant John Morgan and others disposed of and used those funds in one or more of the following ways:

(a) paying fees, commissions, expenses and costs associated with the fraud;

(b) providing refunds and returns of principal to selected investors; and

(c) stealing, converting and taking by fraud monies for their own personal benefit.

*Id.* at 22.

Some investors received refunds of their principal investments after they made repeated inquiries and demands of the Morgans. Several of these investors received refunds only after they had threatened to expose the MEH fraud and contact the authorities. In making these payments, the Morgans "robbed Peter to pay Paul," drawing the funds from wire transfers made by subsequent investors into the MEH Danske Bank accounts. *Id.*

As the scheme proceeded, and more investors did not receive the promised returns on their investments, they began to question the Morgans and their MEH team leaders. When they expressed concern with the Morgans' failure to deliver on their promises regarding the MEH trading programs, John Morgan and others made additional misrepresentations that were designed to lull the investors into a false sense of security and to induce them to postpone their ultimate complaints to the authorities, including, but not limited to, the following:

(a) The release of funds was imminent;

(b) Funds had not been released because of bank holidays, vacations, illnesses, or other pressing business;

(c) If a disgruntled investor contacted the "SEC" or the "FBI", those agencies would initiate an investigation and freeze all

the funds and investors would get nothing back;

(d) The “trade bank” and the “foundation” had required MEH to keep both principal and ROI in place while they continued to trade MEH’s account;

(e) Despite delays, there never was any jeopardy to the principal funds that had never been put at risk;

(f) Danske Bank did not issue any wire-transfers because it was in financial trouble and had not received its bailout package;

(g) John S. Morgan and Marian I. Morgan received a letter from the “chief honcho” at the “trade bank” stating that the funds would be released on a date certain in the near future; and

(h) Because of the intricacies of the banking system in Europe and all the new rules and laws implemented since the start of 2009, the funds had not yet been deposited into the escrow account.

*Id.* at 22-23.

For example, in the Fall of 2007, investor Darryl Groves participated in a conference call with defendant John Morgan and others when he became concerned because he had not received any refunds of principal or payment of profits from the MEH trading program. Groves had transferred $100,000 to the Heckscher escrow account on May 11, 2006. During the phone call, defendant John Morgan told Groves that the delay in the program arose out of the fact that MEH was a relatively small investor in the bank trading platform and the larger investors determined when the funds were released. Morgan promised Groves he would receive his funds in four to six months. Groves never received a refund

of his principal, nor did he receive any payments of purported ROI. *Id.* at 23.

In total, defendant John Morgan and others caused investors to transfer more than $27,402,955.00 for deposit in the Danske Bank and Bank of America ProTap accounts, intended for use in the MEH trading programs. In turn, John Morgan and others caused at least $10,690,965.00 of this amount to be transferred from the Danske Bank accounts to bank accounts in Sarasota, Florida, and elsewhere, owned or controlled by defendants and others, knowing that the investor funds had been stolen, converted and taken by fraud. This figure represents the criminal proceeds of the fraud. Approximately $13,345,708.00 of investors' principal was returned to investors. *Id.* at 24.

John and Marian Morgan used investor funds to purchase a residence and adjoining lot on Periwinkle Drive in Sarasota, Florida. Specifically, in March and May 2006, the Morgans caused investor funds to be transferred to their real estate lawyers in Sarasota, Florida, to facilitate the purchase of the Periwinkle lot (see Counts Fourteen and Fifteen of the Superseding Indictment). Then, on June 1, 2006, the Morgans caused their real estate attorneys to issue check number 103585 in the amount of $1,830,845.58, made payable to the seller's law firm, in order to close the transaction of the Periwinkle lot (Count Sixteen). From 2006 through 2008 the Morgans spent more than $1.2 million in investor funds on mortgage payments for the Periwinkle residence and lot. From 2006 to 2008, the Morgans spent more than $700,000 in investor funds on decorating,

landscaping and renovation costs for the Periwinkle residence and another residence on Tangier Terrace in Sarasota, Florida. *Id.*

In addition, in July 2005, the Morgans spent at least $95,100 in investor funds to purchase the 2003, 29-foot Fountain Powerboat, which they eventually titled in the name of various nominees in order to conceal its ownership. In January 2007, the Morgans spent $24,000 of investor funds on the purchase of a Jaguar automobile. *Id.* at 24-25.

The Morgans continued to solicit investments throughout 2009 and to assure investors that their principal was safe, despite the fact that the balance in the xx4550 account as of April 2, 2009 was $0, and despite the fact that on June 11, 2009 the Securities and Exchange Commission filed a complaint against John and Marian Morgan and others alleging that they had "received millions of dollars from defrauding investors by offering and selling investments in a fictitious prime bank instrument trading program." *Id.* at 25.

For example, back in June and September 2008, the Morgans caused investor Lita Daniels to send a total of $100,000 via wire transfer to the xx4550 Danske Bank account to invest in the MEH Zurich Fund. A year later, on June 21, 2009, Marian Morgan referred to the SEC action when she sent Daniels an email assuring her that "everyone's principle [sic] to go out this coming week and the week after. The lawsuit doe [sic] NOT touch funds in Europe. Do not worry. Returns will go out shortly after principle [sic]." Lita Daniels never received a refund of her principle or any purported ROI. *Id.*

On June 21, 2009, the Morgans caused co-conspirator Eli Heckscher to write a letter to investor Richard Meyer in which Heckscher falsely confirmed that Meyer's funds were still in the Heckscher escrow account. John Morgan knew that on that date the balance in the xx4550 escrow account was $0. *Id.*

On June 25, 2009, John and Marian Morgan attended a hearing in the SEC action in United States District Court in Tampa, Florida. Shortly thereafter they flew to Europe and then to Sri Lanka. They intentionally did not return to Tampa for a scheduled hearing in the SEC action on July 16, 2009. On or about July 23, 2009, defendant John Morgan had a phone conversation with team leader John Harrod in the United States in which he assured Harrod and an MEH investor that the trading programs were successful and releases of principal and ROI would occur shortly. As of August 2009, John and Marian Morgan were still assuring investors that their principal was safe and they would be receiving payments shortly. John Morgan knew that the balance in the xx4550 account at that time remained $0. *Id.* at 26.

On August 13, 2009, John and Marian Morgan were arrested in Sri Lanka and charged with submitting forged financial instruments to a financial institution and a "cheating" offense. They remained in Sri Lanka until they were deported from Sri Lanka to the United States on or about December 11, 2009. *Id.*

**IV. <u>Argument</u>**

Based on the above facts, the United States is entitled to a $10,085,375 forfeiture money judgment against John Morgan, which represents a portion of

the proceeds obtained as a result of the conspiracy charged Count One of conviction. *See United States v. Padron,* 527 F.3d 1156, 1162 (11th Cir. 2008) (district court may issue a forfeiture order in the form of a money judgment in mail fraud cases); *United States v. Navarro-Ordas*, 770 F.2d 959, 969 (11th Cir. 1985) (endorsing entry of forfeiture money judgment against RICO defendant); *United States v. Vampire Nation*, 451 F.3d 189, 202-03 (3d Cir. 2006) (court may issue a forfeiture order for the amount of proceeds the defendant obtained from his fraud offense, even if he is unable to satisfy the judgment at the time he is sentenced).

The United States seeks a forfeiture money judgment when the defendant no longer has the actual dollars or traceable property in his possession, or when the United States cannot locate the assets. In these cases, the defendant's forfeiture obligation simply takes the form of a forfeiture money judgment in favor of the United States. *See Padron*, 527 F.3d at 1161-62; *United States v. Conner,* 752 F.2d 566, 576 (11th Cir. 1985) (ordering money judgment for amount of RICO proceeds). Because the United States cannot locate the actual fraud proceeds the John Morgan obtained as a result of his participation in the conspiracy, the United States is seeking, pursuant to Fed. R. Crim. P. 32.2(b)(2), a $10,085,375 forfeiture money judgment against him.

If the Court determines that the defendant obtained $10,085,375 in fraud proceeds as a result of his participation in the conspiracy (or any other amount

deemed appropriate by the Court), then the Court must enter a forfeiture money judgment against Morgan in that amount, pursuant to the provisions of 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and Fed. R. Crim. P. 32.2(b)(2).

In addition, based on the facts contained in Morgan's Plea Agreement (Doc. 139, at 24-25), and the previously issued seizure warrant for the vessel, the United States is entitled to forfeiture of the 2003 Fountain Lightning Fever Powerboat and 402 HP Mercruiser Engine, pursuant to the provisions of 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), 18 U.S.C. § 982(a)(1), and Fed. R. Crim. P. 32.2(b)(2).

## V. Conclusion

Pursuant to 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and Rule 32.2(b)(2), the United States respectfully requests that this Court enter a $10,085,375 forfeiture money judgment against defendant John S. Morgan, for which he will be jointly and severally liable with co-defendants Marian Morgan and Stephen Bowman. The United States further requests that the Court enter a Preliminary Order of Forfeiture for the 2003 Fountain Lightning Fever Powerboat and 402 HP Mercruiser Engine, pursuant to the provisions of 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), 18 U.S.C. § 982(a)(1), and Fed. R. Crim. P. 32.2(b)(2).

Pursuant to Rule 32.2(b)(4)(B), the United States requests that the Court include the forfeiture when orally announcing the sentence, and include the

forfeiture order in the judgment. *See United States v. Kennedy*, 201 F.3d 1324, 1326 (11th Cir. 2000).

Because the United States is entitled to forfeiture of substitute assets in satisfaction of the forfeiture money judgment, the United States requests that the Court retain jurisdiction to enter any orders necessary for the forfeiture and disposition of substitute assets, and to address any third party interests that may be asserted in an ancillary proceeding.

Respectfully submitted,

ROBERT E. O'NEILL
United States Attorney

By: *s/Josephine W. Thomas*

JOSEPHINE W. THOMAS
Assistant United States Attorney
Florida Bar Number 31435
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
(813) 274-6000 - telephone
(813) 274-6220 - facsimile
E-mail: josie.thomas@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on November 9, 2011, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Peter Anthony Sartes, Esquire

Barry Cohen, Esq.

Cherie Krigsman, Esq.

*s/Josephine W. Thomas*
JOSEPHINE W. THOMAS
Assistant United States Attorney