UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

Case No. 8:09-CR-585-SCB-TBM
28 November 2011
Tampa, Florida
10:00 a.m.

-vs-

JOHN S. MORGAN,

Defendant.

---------------------------------/

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE SUSAN C. BUCKLEW
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Government: CHERIE KRIGSMAN, ESQUIRE
Assistant United States Attorney
United States Attorney's Office
400 North Tampa Street
Suite 3200
Tampa, Florida 33602-4798
(813) 274-6344

For the Defendant: ROBERT M. TAGER, ESQUIRE
Law Office of Robert M. Tager
Suite 216
2785 Gulf to Bay Blvd.
Clearwater, Florida 33759-3904
(727) 723-1616

FOR THE PROBATION DEPT.: DAVID TREMMEL

Reported By: PAUL K. SPANGLER, RPR,
Official Court Reporter
Certificates of Merit and
Proficiency, Notary Public
(813) 301-5898

STENOGRAPHICALLY RECORDED
COMPUTER-AIDED TRANSCRIPTION
BY ECLIPSE

INDEX TO WITNESS


| Witness | Page |
|---|---|
| JOHN SUMTER MORGAN | 4 |

(10:00 a.m.) P R O C E E D I N G S

THE BAILIFF: All rise, please, for the Court.

(Pause.)

This Honorable Court is again in session.

Please be seated, come to order.

THE COURT: Good morning.

ALL PARTIES: Good morning.

(Pause.)

THE COURT: All right. The matter that is set this morning and set for sentencing is the United States of America versus John Morgan. This is a criminal case. The case number is 09-585.

Let me ask if the attorneys will state their appearances. And we'll start with counsel for the United States.

MS. KRIGSMAN: Good morning, Your Honor. Cherie Krigsman for the United States.

And with me at counsel table this morning is Special Agent Chris Hall of the IRS.

THE COURT: Good morning.

MR. TAGER: Good morning, Your Honor. Robert Tager on behalf of John Morgan, who is seated to my right.

THE COURT: All right, Mr. Tager.

Mr. Morgan, if you would stand, please.

And Ms. Vizza, would you swear him in.

THE DEPUTY CLERK: Yes, Your Honor.

Please raise your right hand.

Thereupon,

JOHN SUMTER MORGAN,

the defendant, having been duly sworn, testified as follows:

THE DEFENDANT: Yes, I do.

THE DEPUTY CLERK: Thank you.

THE COURT: Mr. Morgan, would you state your true and correct name, please, sir.

THE DEFENDANT: John Sumter Morgan.

THE COURT: And in the past 24 hours have you had any medications or drugs?

THE DEFENDANT: No.

THE COURT: No, you're not taking any medicine?

THE DEFENDANT: None at all.

THE COURT: Okay.

I have in front of me a Presentence Investigation Report. It was prepared by the Probation Office. The probation officer is present up here in the jury box who prepared it. I have read that report. Have you had an opportunity to read the report and discuss it with your attorney?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you need any additional time to do that?

THE DEFENDANT: No.

THE COURT: Okay. Thank you, sir. You may have a seat.

Mr. Tager, is there any legal reason that I shouldn't proceed with sentencing this morning?

MR. TAGER: No, Your Honor.

THE COURT: All right.

Ms. Krigsman?

MS. KRIGSMAN: No, Your Honor.

THE COURT: Let me just ask a couple of preliminary questions.

Restitution. I know that with respect to Mr. Bowman I received a motion to set restitution off. I don't see anything in my report that will allow me to know who to give restitution to, and yet it is mandatory, so what about restitution in this case?

MS. KRIGSMAN: In this case, Your Honor, I have prepared and brought to court today two schedules. One is a detailed schedule with names of victims and addresses for serving with the clerk's office. The other schedule is the redacted schedule with just the names and the amounts.

And you'll see at the bottom of the schedule there's one entry for Bowman Marketing Group victims. And at a later time we'll supplement once we determine the Bowman Marketing Group victims.

The amount of loss, though, attributable to the Bowman Marketing Group victims that pertains to Mr. Morgan, however, is not in dispute, so we know that chunk of money is going to go to Bowman Marketing Group victims. And that will be the only part of the restitution that we would supplement at a later date.

THE COURT: Okay.

Let me ask you about the forfeiture. I had a motion for forfeiture money judgment, preliminary order of forfeiture which was filed on November the 9th, 2011, and it requests forfeiture of any interests that Mr. Morgan might have in a Lightning Fever power boat, but it also asks for a money judgment -- let me find the amount because that was what was -- I had a question about.

$10,085,375. I wasn't sure where that figure came from in light of the fact it didn't coincide -- didn't seem to correspond to the loss or anything that I could figure out.

MS. KRIGSMAN: Yes, Your Honor. I believe that Ms. Thomas just relied on the prior, uh -- the prior determination of proceeds to, uh -- and what she was relying and the figure that we were able to trace definitively into the hands of John and Marian Morgan that they used for their own personal benefit. The loss, however, to the victims is much higher.

THE COURT: Okay.

So you're still -- you're still sticking with the money judgment figure of $10,085,375?

MS. KRIGSMAN: That's correct, Your Honor.

THE COURT: Okay.

Have you given Mr. Tager the restitution charts that you're telling me about?

MS. KRIGSMAN: We --

MR. TAGER: Yes, I have received them.

THE COURT: Okay.

Do you have a copy for me?

MS. KRIGSMAN: Yes, Your Honor.

(Pause.)

And I'm handing up both the one that can be attached to the judgment and committal and the, uh, more detailed version to send to the clerk.

THE COURT: Thank you.

Okay.

(Pause.)

On November the 21st, 2011, Ms. Krigsman, the Government filed a 5K1 motion and suggested it appropriate that I depart downward two levels; is that correct?

And I'll talk more about it in a minute.

MS. KRIGSMAN: Yes, Your Honor.

THE COURT: Is there anything else that you might have filed in this case -- well, I'm sorry. I haven't --

haven't gone over everything.

I have also received a number of victim impact statements, and I won't read who they're from, but I'm assuming that this was supplied by the Probation Office.

But other than the victim impact statements, the motion for downward departure, the restitution, the forfeiture, is there anything else that the Government's filed in this matter that I should be aware of?

MS. KRIGSMAN: No, there is not, Your Honor.

THE COURT: All right. Thank you.

Okay. Let me -- Mr. Tager, I'm going to go over and ask you similar questions just to make sure that I have everything.

I have a number of letters on behalf of Mr. Morgan that I have been supplied with, both those mailed directly to chambers from family members, friends and so on, some that were e-mailed, some that I think were e-mailed over the weekend or sometime recently. Anyway, I just got them.

Other than that, let me just verify, I'm not aware that you have filed anything; is that correct?

MR. TAGER: I have not, Your Honor.

I do have one exhibit I am going to be asking to introduce, uh, later on if the Court would like a copy of it now. This is the sworn affidavit that Mr. Morgan had written out while he was incarcerated.

THE COURT: I remember.

Okay. Yes, I would like a copy.

(Pause.)

MR. TAGER: Judge, also I have one additional letter from a family member, from Lesley Morgan. I'm not sure if the Court received that. That was given to me this morning by --

THE COURT: Sure.

MR. TAGER: -- his mother. If I may also provide a copy of that to the Court.

THE COURT: All right. I have read all the others, but I have not read that one, clearly.

MR. TAGER: This is Mr. Morgan's brother, Your Honor. He could not be here today.

(Pause.)

THE COURT: Thank you.

Well, I might have read that actually.

MR. TAGER: Maybe he might have gotten it to you, Your Honor. I just in an abundance of caution.

(Pause.)

THE COURT: Yes, I think that is one that I received.

Yes, somehow I got that. It was e-mailed to my chambers and then forwarded to me, so I have read that. Okay.

All right. Let me just go over a couple of things.

Mr. Morgan, you pled some time ago now pursuant to a plea agreement, and you entered a plea to -- under the plea

agreement to Count One of the Indictment and Count 16 of the Indictment. I'm saying "Indictment." It should be Superseding Indictment.

Count One was the conspiracy count, and Count 16 was one of the money laundering counts. I accepted that plea, adjudicated you guilty. And the probation officer has done an advisory guideline calculation and has suggested that under the advisory guidelines before any departure or anything based on your substantial assistance that the total offense level --

(Pause.)

Well, the probation officer has suggested that the total offense level should be a 37. You have a criminal history category of I. And under those guidelines, the range of imprisonment as actually capped by the statutory maximum would be 180 months.

The -- there are some objections, and I'm going to deal with those in a minute, but I will tell you that the way the guidelines have been computed -- and I know you know this -- is that you start out with a base offense level, which is a six, and then there is an increase depending upon the amount of loss.

And in this particular instance the loss to others was more than 7,000,000, but less than 20,000,000. Actually I think it was stipulated to $17,427,850 as being the amount of loss.

So that would be a 20-level increase. There's a four-level increase because there were more than 50 victims in this case who suffered pecuniary harm. There is also a two-level increase for the violation of Judge Lazzara's injunction. And I know there's a -- there's an objection to that.

And there is a two-level increase because of the fact that this was -- well, for a couple of reasons. Sophisticated means was -- was -- took part outside of the United States at least in part. And there is a four-level -- according to the probation officer a four-level increase for your role in the offense as being a leader and organizer.

(Pause.)

Then there's suggested there's a two-level increase for the abuse of a position of trust, suggesting that you were in a position of trust as related to all of those investors who invested money with you. And that's how we come out to the guideline, the total offense level that I have just talked about.

I know that there are some objections to those advisory guidelines, and I would like to start there if you don't mind.

Ms. Krigsman, let me ask you a question.

As far as the role is concerned -- and the suggestion in the Presentence Investigation Report was that Mr. Morgan

receive a four-level increase for being that of an organizer or -- an organizer, the -- the top in this conspiracy. However, Mr. Tager had suggested that you all had agreed that he should receive no more than a three-level increase; is that correct?

MS. KRIGSMAN: Yes, Your Honor, that's a provision that is specifically set forth in the plea agreement.

THE COURT: Yes, I was trying to find that. I remember reading it now. I can't seem to put my finger on it, but --

MS. KRIGSMAN: It's on page five, Your Honor, at the top.

THE COURT: Okay.

Yes, it does say the United States recommends to the Court that the defendant receive a three-level upward adjustment for his role in the offense, and the defendant understands this is only a recommendation, it's not binding on the Court.

But that's still your recommendation?

MS. KRIGSMAN: Yes, it is, Your Honor.

THE COURT: Okay. Thank you.

All right. Other than that, Ms. Krigsman, does the Government have any unresolved objections regarding the facts or the -- or the guideline calculations?

MS. KRIGSMAN: No, Your Honor.

THE COURT: Okay.

Then, Mr. Tager, I'll let you begin. You have several.

MR. TAGER: Yes, Your Honor.

THE COURT: And we'll take them in whatever order you would like to address them.

MR. TAGER: Your Honor, I think I'm going to address them in the order in which they present themselves in the PSR.

The first one --

THE COURT: All right.

MR. TAGER: -- the violation of a prior injunction. Your Honor, our objection to this is that any conduct that Probation believes was attributable to Mr. Morgan was actually conduct by Marian independently and absent any involvement by John.

The issues seem to be for one thing that, uh, he didn't return any funds per Judge Lazzara's order. I think the records have shown there are no funds, or whatever funds that remain are under the control of Eli Heckscher over in Denmark.

There are no accounting records because John Morgan does not possess any accounting records. The Government served on him after he pled, after he agreed to cooperate, a subpoena duces tecum for any and all records he has related to any banking, finance, any monetary transfers, all accounts. He has none of those records. We advised the Government of that.

They were satisfied with that answer.

Uh, in fact, even all of the laptops they seized coming into the country. All of the paperwork indicate that there were very few financial documents that Mr. Morgan and even Marian Morgan ever, uh, controlled. And it was John Morgan's position from the beginning he never received statements from Eli.

He doesn't know how Eli was paid because as an attorney, to remind the Court, Eli Heckscher, the attorney in Denmark who facilitated all the monetary --

THE COURT: I remember vividly.

MR. TAGER: Yes, ma'am.

He never -- John doesn't know how he got paid, how much he got paid, if he was taking a percentage or anything else. He never saw any of the banking records.

In fact, he very rarely had any contact with Mr. Heckscher except several meetings they had in Denmark. I think there was a total of three to my knowledge and one or two other communications with him, but pretty much it was always Marian communicated.

As far as, uh, the issue presented that they were continuing to lull investors and claimed the funds would be distributed shortly, once again that is all Marian Morgan. That also has to go towards the argument that we have in the role of the offense.

All of these people that were under John or Marian Morgan, uh, that were soliciting the victims in this matter were all people that come from Marian Morgan's multi-level marketing, uh, years of experience. These are her contact people. She initiated them. She brought them in. She asked them to sell these products. They went out and sold them.

She's the one that kept telling the -- the victims or the middle men the money's coming. It's a holiday in Denmark. We can't get to it. Oh, good news, we just found out they're releasing the funds. Oh, I don't know what happened to the funds. Eli's on vacation. If you talk to the FBI, you're never going to see your money. All of these communications came from Marian.

Uh, John was with her. However, he did not communicate. He did not continue to lull investors, uh, or lenders or the victims in any way, shape or form. Uh, and for that reason I believe that this, uh, two-level enhancement should not apply.

I mean, although there was clearly violation of Judge Lazzara's order, I mean that -- that can't be disputed, the issue is that John Morgan did not do these things. These are all products of Marian Morgan's e-mails and phone calls and promises and threats and the whole nine yards.

THE COURT: Okay. Let's take these one at a time if

you don't mind.

MR. TAGER: Yes, ma'am.

THE COURT: And if you have anything else on that objection --

MR. TAGER: No, ma'am, not on that issue I do not.

THE COURT: Okay.

Ms. Krigsman, I'm assuming you think it's appropriate?

MS. KRIGSMAN: I do, Your Honor.

THE COURT: All right. Why don't you tell me why.

MS. KRIGSMAN: I think the record from the SEC case is clear that John Morgan and Marian Morgan were both, uh, involved in that litigation. Uh, in fact, uh, the defendant, uh, Mr. Tager, they -- they have received a copy of the transcript of the hearing in front of Judge Lazzara, uh, on June 25th, 2009 here in this courtroom.

And that is where John Morgan appeared alongside Marian Morgan. He told, uh, the Judge that he was the president of Morgan European Holdings. He told the Judge that he was -- that he and his wife were the sole shareholders and that they were managers. He did most of the speaking on behalf of the Morgan European Holdings at that hearing.

He -- he articulated the fact that Morgan European Holdings would consent to the preliminary injunction. That preliminary injunction did include, as Mr. Tager said, a

provision for repatriation of funds. Uh, and the evidence does indicate that there were no funds left at that point.

But the injunction also explicitly ordered the Morgans to provide an accounting. And we know from the evidence produced in the case and also the evidence that Your Honor had an opportunity to see at trial that when the Morgans came back across the border in December 2009, their suitcases were filled with all kinds of investor documents.

Now, were there detailed accounting records that one might expect to see if one were investigating a CPA? No, there were not. But there were dozens of investor contracts which Mr. Morgan himself signed. Uh, those contracts indicated the name and addresses of investors and the amounts they had invested.

And there were also handwritten investor lists among the luggage, all documents that could have assisted Mr. Morgan and Mrs. Morgan in compiling an accounting for the Court, which they never made an attempt to do.

And I think what -- what really, uh, caps this all off nicely is the fact that John Morgan and Marian Morgan made their intent to disobey Judge Lazzara's order when they skipped town and they failed to return and appear for a hearing as they had been ordered by Judge Lazzara.

The evidence at trial showed that they knew that there was a hearing and they were deliberately disobeying the

Court's order in not showing up for that hearing.

And for those reasons we believe that John Morgan should be held accountable for the failure to obey Judge Lazzara's order.

THE COURT: Okay.

Mr. Tager, that was one thing that occurred to me as well. They did not appear in court and they were out of the country as I recall. And why would that not be a violation?

MR. TAGER: Judge, I mean, it's clearly a violation I mean of the Judge's order. That's a hard thing to get around. It was --

THE COURT REPORTER: I'm sorry.

MR. TAGER: I mean, it was clearly an order of the Court that they return. There was an issue of whether or not they had ever received notice. Uh, notices were mailed. Notices were placed on the door.

We're not disputing notice because subsequent to my involvement in the case, uh, you know, there was e-mails that go to Eli from Marian. Oh, we just got an e-mail or we just found out we have a court date, do we need to go?

Eli Heckscher, the lawyer in Denmark, tells Marian, no, you don't need to worry about it, you don't need to go there. And I'm not saying that they relied on the word of a lawyer because he's obviously a little bit more than a lawyer as it's involved in this entire episode.

Uh, but for me to clarify this, Judge, John's knowledge of what everything is involved in this, although this is a huge scheme, is much more limited than what Marian's knowledge is. And when Marian tells John something, John does it. When Marian says to John, we don't need to go, don't worry about it, it's all going to be taken care of, John relies on that.

And although they're missing a court hearing, uh, I do not believe that that rises to the level of violating the Court's injunction because it's not an enhancement for missing court or of a failing to appear for court. The enhancement is for failing to provide an accounting.

And again, all of those papers, all of those documents, all of the computers, all that stuff is controlled by Marian. As the Government says, there's no money left over there. They're aware of that. So that can't be returned back.

The main issue as I saw it reading the objections that Probation took and that I assume Judge Lazzara would probably take is that while the injunction is in place, you are not to contact investors, you are not to continue this conduct any further, that one of the two is still contacting investors, still trying to lull them into giving them more time, still trying to threaten them not to release information to the FBI or the IRS or to any other Government agencies.

To me that's where that two-level enhancement is

because the other things are not things that John has at his disposal that he's able to provide.

And the issue of the lulling the investors or the continuation, there was no continuation of solicitation for money from investors or lenders or victims. That ended. But what there was was the threats, the intimidation, the lies. And that all came from Marian.

So Marian clearly is responsible as far as the two levels go, but John didn't have any of that involvement. He very rarely, if ever, communicated with almost any of these people that were below, uh, him and Marian, the middle level managers or the middle level salespeople. He had very little contact with them. This is all -- these are all directives comings from Marian.

And for that reason I do not believe Mr. Morgan should receive this enhancement. He did none of the things that's alleged. And the things that he didn't do such as the accounting or the, uh, return of the money is not something he had in his ability to do.

And although he stood before Judge Lazzara, I'm the president and everything else, that doesn't -- I don't think that means anything because the president of a scam company doesn't really carry any weight.

I mean, all of the officers are involved in this scam. So just because he holds himself out and on a document

that Eli prepared says he's the president doesn't mean he has any of the paperwork, doesn't mean that he has access to any of that paperwork. That's stuff that Marian controlled very closely to her. And for that reason, Your Honor, I ask the Court not to give that enhancement.

THE COURT: Okay.

Well, I just have two comments, and I may be making it again before we end this hearing, but I don't think Mr. Morgan is stupid. I don't think he's blind, deaf and dumb. And I'm not discounting the fact that Marian Morgan bears much responsibility for this, but she doesn't bear all the responsibility for this.

And clearly there were documents by which some type of an accounting could have been made. I mean, we had hundreds of documents that were seized from them when they reentered the United States. Certainly there were -- was the ability to make some sort of an accounting.

I don't disagree that there was no money left to return, but there was continued lulling going on. There was a -- a neglect to abide by the order to give an accounting. And I think he had the ability to do some of that.

And there was also the fact that he did not appear in court. So for all of those reasons I'm going to overrule the objection. I think the increase is inappropriate.

So let's go to the next objection, which --

MR. TAGER: Role in the offense.

THE COURT: Yes, his role.

And you agreed three levels, so we're not going to --

MR. TAGER: Yes.

THE COURT: Okay. Then I'll sustain that objection.

All right. Abuse of a position of trust.

MR. TAGER: I objected to this. There is no public or private trust in this matter that Mr. Morgan had abused. Uh, this is an economic type crime. And anytime there's an economic type crime, there's always some level of a trust. I mean, people don't give money to somebody they don't trust. They only give money to the people that they do trust.

THE COURT: That's true.

MR. TAGER: And they gave money to Mr. Morgan not because of who he was or who he held himself out to be in the public community or the private community. They gave it to him because they believed in a dream he was selling, or a fantasy, extraordinarily large returns on their money. And that's it.

It's not like he's a president of a bank, president of a big corporation or somebody that just has access to money, then just takes it. He's more akin to just a used car salesman who says, this car runs fine, trust me. The people give him the money, then they drive it off the lot and the car dies.

Uh, that's not a position of public trust. It's not anything. And I do not believe that this enhancement, uh,

would be appropriate.

And by reading the, uh, application notes, it seems as though it appears that this mostly goes towards the officer of a bank who has control over everybody as opposed to just a bank teller who just sits at the window and takes in the money.

But again, I do not believe that this is public trust or private trust as contemplated by, uh, 3B1.1. I would ask the Court to not grant that.

THE COURT: Okay.

Well, the application note does say that persons holding such positions are ordinarily -- ordinarily are subject to significantly less supervision than employees whose responsibilities are primary -- primarily nondiscretionary in nature. And I think that certainly is descriptive of what occurred or what was happening here.

For this adjustment to apply, the position of public or private trust must have contributed in some way -- some significant way to facilitating the commission or the concealment of the offense.

The adjustment, for example -- and then there's your example -- applies in the case of an embezzlement of a client's fund if the -- if the person is an attorney who is acting as a guardian or a bank executive or someone like this and sets aside a teller. I assume it would apply to a stockbroker or someone of that sort.

But at any rate, Ms. Krigsman, what's the position of the Government on the role or on the increase for the abuse of position of trust?

MS. KRIGSMAN: Your Honor, the Government believes that the enhancement is appropriate and in fact it's almost a textbook case of abuse of position of trust.

Mr. Morgan clearly occupied a position that allowed him great, uh, discretion. Uh, he was the president of the company. There are only three people in the whole conspiracy who knew exactly where the money was and how long it stayed there and where it went. And those people were John Morgan, Marian Morgan and Eli Heckscher.

Mr. Morgan acted as a sort of fiduciary. He promised his investors that their money would be held safe in the escrow account of lawyer Eli Heckscher over in Denmark.

And I might point out, Your Honor, that in the plea agreement on page 19, uh, the stipulated facts -- they're actually facts in the plea agreement that support the enhancement.

Uh, and specifically on the bottom of page 19 there's a paragraph that talks about how John Morgan spoke about the MEH trading programs with investor Bor -- Boris Dwornik of Ancaster, Ontario and another individual by telephone. Morgan stated that it was -- he was a financier who managed funds for wealthy individuals and had connections with officials at banks

and exclusive arrangements to invest in notes that were used as security by banks in short-term loans.

At the bottom of page 20, uh, another fact. In one subsequent call with defendant John Morgan, Dwornik offered to fly to Denmark to pick up a certified check. Morgan told him that the issuance of checks was against banking regulations. And he told Dwornik that wire transfers of principal would occur soon.

These facts illustrate that John Morgan was in a position of trust. That he -- his position allowed him to both commit and conceal the offense. He used his position to conceal the offense and keep the investors hanging. And he also used his, uh -- his statements of professional expertise and knowledge of an esoteric area of investment to gain the reliance of the investors.

Your Honor, in the Eleventh Circuit, uh, the -- the view of the -- the -- this enhancement is assessed from the victims' perspective. And that's based on United States versus Garrison, an Eleventh Circuit case from 1998.

And clearly what we've seen from both the plea agreement and the testimony at trial is that the victims certainly thought -- they trusted John Morgan. They thought he was in a unique position to help them make money on their investments.

THE COURT: Had a special skill?

MS. KRIGSMAN: Right.

THE COURT: Yes. There's no doubt in my mind that this should apply to John Morgan.

The only way that the investors -- and it still is a puzzle to me why this happened in almost all of these instances. But the only way the investors agreed to invest was not only because of the fact that they thought they were going to get these incredible returns, but they had to trust the expertise of John and Marian Morgan to get these returns, that they were knowledgable, that they knew about these things and that for that reason that they were investing with them.

I think this is absolutely appropriate in this instance, so I'm going to overrule the objection.

MR. TAGER: May I just point out one other difference --

THE COURT: Yes.

MR. TAGER: -- quickly.

You know, it's different if Mr. Morgan has an office where he has fake certificates hanging on the wall or if he has fake licenses hanging on the wall or he has pictures with himself and, you know, Warren Buffett and presidents and vice-presidents, you know, and he creates this air of being an authoritarian on, you know, these kind of things.

None of that was here. Nobody came and said, I'd like to come and meet with you at your office, I'd like to come

and see where you operate at. He said things that was necessary to perpetrate the crime.

Because as I said initially, nobody gives money to somebody that they don't trust. And if it's simply well, they trusted him, therefore they gave him the money, then anytime there's a financial crime involved, then automatically that enhancement would either apply or it's already contemplated within the guidelines.

So to give an additional two levels, uh, I believe is almost double dipping. Either -- every financial crime covers the enhancement for abuse of position of trust, therefore it's built into the guidelines, or I think that there's -- that there has to be more of an effort on Mr. Morgan of convincing these people that he is somebody that he is not. Certificates and that --

THE COURT: Well, we certainly heard lots of evidence about that, about him talking to investors and that sort of thing.

MR. TAGER: Yes, ma'am. That's just my argument, Your Honor. I mean, I could say I'm a pilot, you know, and I could say, I'm going to fly everybody somewhere. But, you know --

THE COURT: Well, I don't --

MR. TAGER: -- if I'm not working for a big airline and, you know, I start walking out towards the airplane, I'm

sure someone's going to say, where's your pilot's license or, you know, that type of stuff. That's just my argument.

THE COURT: All right.

You know, again I think it's clear that it applies in this case and that the reason that -- the reason that the investors albeit maybe it wasn't wise, but the investors invested all of this money was they had confidence in Mr. Morgan and Ms. Morgan's ability to do what they said they were going to do and have the knowledge that they have stated -- or they stated that they had.

And according to the testimony we heard at trial, Mr. Morgan was instrumental in getting a lot of these investors in. He was the first person that talked to them.

But at any rate I -- I still think it's appropriate. You know, you're right as far as most of these fraud schemes, it usually is an enhancement because people don't invest if it's not -- they're investing with a person that they trust and they're investing in part because they think they're going to get these miraculous returns, but they're investing with that person. That person is why they're investing.

So I'm going to again overrule the objection. I think it's appropriate.(10:35 a.m.)

MR. TAGER: My final one I have, Your Honor, is acceptance of responsibility, a three-level reduction.

Judge, subsequent to my filing of the objection I did

find a case out of the Eleventh Circuit which seems to indicate that, uh, it is proper to consider this under -- as a variance as opposed to under the guidelines.

THE COURT: That he didn't get -- really get any acceptance because of the maximum penalty?

MR. TAGER: Correct. So I guess we have to go to the maximum penalty and then deal with it from -- from that angle.

THE COURT: Okay.

Well, we've made the correction regarding the minor role, so that would be a -- I don't know where we are. That would be a 36/1. That would be still above the maximum, 188 to 235 months.

Let's talk about -- let's talk just a minute about cooperation and substantial assistance by Mr. Morgan.

You filed a 5K1 motion, and, Ms. Krigsman, you suggested that I depart downward two levels. I know about the affidavit that Mr. Tager earlier gave me a copy of based on what had -- what happened during trial.

Mr. Morgan pled guilty when I'm sure it was very difficult to plead guilty with his wife not pleading guilty and going to trial. And there was some cooperation and as I understand it a willingness to testify, although probably he wasn't anxious to testify at the trial, but I'll let you begin.

The 5K1 motion.

MS. KRIGSMAN: Yes, Your Honor.

As stated in the motion, uh, for a 5K1 departure, the defendant did plead guilty more than two months before trial saving the Government resources in preparing for trial and conducting a lengthy trial involving Mr. Morgan.

Uh, and as I stated in the motion, he did agree, although the plea agreement did not require him to, uh, he did agree to -- as we got nearer to trial, he did agree to testify in case in chief against his wife if the Government asked him to. We ultimately decided for a number of reasons not to do that.

But as the trial played out, as Your Honor knows, it became relevant to call Mr. Tager in his stead for a sort of discrete matter that the defendant raised -- defendant Marian Morgan raised when she took the stand.

And when I called Mr. Tager, uh, to inquire about Mr. Morgan's willingness to waive attorney/client privilege so that Mr. Tager could take the stand and testify against Marian Morgan, uh, the response was instantaneous, and there was clearly a willingness on Mr. Morgan's part to cooperate to the fullest extent.

And for those reasons and because of that affidavit which Your Honor knows that we showed to Ms. Morgan at the beginning of the trial as an effort to get her to agree to plead prior to embarking on another three weeks of trial, it didn't work, but again Mr. Morgan, uh, stepped forward and

agreed to do that on a moment's notice.

THE COURT: Has he -- did he sit down with you and fully debrief and discuss the scheme and all of that?

MS. KRIGSMAN: Uh, he did. He met with the agents on maybe three occasions -- three different occasions and discussed the scheme. His -- his memory was a little bit spotty, but, you know, when we would show him documents, uh, that --

THE COURT: Intentionally spotty?

Are you suggesting intentionally spotty or something else?

MS. KRIGSMAN: No, I'm not suggesting that, Your Honor.

THE COURT: Okay.

But you are recommending that it's appropriate that I depart downward two levels?

MS. KRIGSMAN: Yes.

And Your Honor, Mr. Tager called and -- called me and -- and asked for more levels and, uh, we discussed it within the office. And I think the ultimate outcome was we very seriously considered Mr. Tager's request.

Uh, the office's position is that when you cooperate within your own case, it's generally a two-level reduction. And sometimes if you testify or put yourself in a position of danger, it can be more. And that was -- that was our ultimate

decision.

THE COURT: You don't think he's -- he was in a position of danger? Joking.

MS. KRIGSMAN: Maybe so, Your Honor.

THE COURT: All right.

Okay.

All right, Mr. Tager.

MR. TAGER: Your Honor, can I approach with the Government real fast on one matter I'd like to put on the record?

THE COURT: Sure.

(Thereupon, the following discussion was had at the bench:)

MR. TAGER: He also recently cooperated with authorities from Denmark --

THE COURT REPORTER: I'm sorry.

THE COURT: You're not picking it up?

THE COURT REPORTER: No.

MR. TAGER: He's also agreed and has debriefed with the -- I guess law enforcement from Denmark concerning, uh, Mr. Heckscher, and I just wanted to let the Court know that was something else he had done. The Government doesn't really want that public knowledge, which is why I wanted to approach and advise the Court of that.

THE COURT: Okay. Well, and I was joking. I mean,

it has got to have been really hard for him --

MS. KRIGSMAN: Right.

THE COURT: -- to have pled guilty in this case.

MR. TAGER: Yes, Judge.

THE COURT: I mean, I don't know how that factors in exactly, but I'm sure it was really difficult.

MR. TAGER: I'm going to argue that, Judge.

THE COURT: Yes.

MR. TAGER: Thank you.

(Thereupon, the bench discussion was concluded and the proceedings resumed as follows:)

MR. TAGER: Your Honor --

THE COURT: Mr. Tager.

MR. TAGER: Your Honor, we're asking for an additional four levels. Uh, here is the situation, Judge. As the Court, uh, kind of referenced, it was very difficult for Mr. Morgan to enter this plea. I know the Court's heard a lot of testimony. I wasn't present during the testimony, but it's my understanding a lot of the victims came up, a lot of the -- the real estate agent. Other people came forward and said how Marian had a real control, was dominating.

Uh, as an example of the control Marian has over -- over Mr. Morgan, he had wanted to plea for a while. Uh, and initially prior to the date that he finally entered the plea, we had multiple joint meetings where the conversation was

simply to plea, and it had gotten a little heated, a little difficult.

And, uh, Mr. Morgan stood by I'm entering a plea. And he has advised and given me consent to divulge attorney/client communication as well as work product for purposes of this hearing, Your Honor.

But he continuously told Marian, I'm going to enter a plea. I want you to do it with me. John's desire was for them both to enter the plea together because for whatever reason -- and I don't mean that in a bad way -- he loves his wife and he wants to see them both walk off the plank together so to speak to use a term he used.

And she kept saying, I'll think about it. I'll think about it. We'll talk about it. So it was a constant delay tactic on her part.

Finally, the matter got set for hearing, and John hoped that this would convince Marian to jump on board. It didn't. And somehow Marian ended up getting set on the calendar that same day.

THE COURT: Yes, I remember that.

MR. TAGER: So John and Marian traveled over in the van together. The whole entire trip was Marian berating John, I can't believe you're going to do this. You're abandoning me. You're leaving me alone. You're leaving me out there to dry. You know, we always did everything together. The whole -- the

whole nine yards.

Which is why when the Judge -- when this case was called before Your Honor and Your Honor said, I understand you have a sentencing -- a plea set right after this hearing, John said, I'm not sure if I want to go forward with it.

THE COURT: Yes, I remember.

MR. TAGER: And she had such -- everything -- I mean, it was bad, Judge. So even though -- you know, it was a very difficult decision, not so much the physical, but just the emotional part and the emotional connection that he has to his wife for whatever reason it is. So the Court suggested that we have a discussion in the back. And we left the plea set on the calendar.

Uh, as soon as I went downstairs and spoke to -- spoke to Mr. Morgan at the Marshal's hold center, the first question, John, do you want to do this or not? If you don't, that's fine, we'll go back and we'll work up a defense. If you want to do it, this is the time.

First thing out of his mouth, I want to do it. There was no ands, there was no nothing. There was no -- no capitulation. There was no, uh, misunderstanding. He just couldn't do it in front of her. He just couldn't stand up to her at that point.

He enters a plea. Everything is clear. Now Marian begins with the he was coerced. He must have been forced to do

this. My John would never do this.

We had joint meetings following that. Now, the jail prevented us from having joint meetings at some point because they were passing magazines or letters to one another. So we had to get special permission from the Magistrate to go in to do that, which he graciously did. And all of those meetings revolved around Marian pleading and joining with John.

He has done everything he could short of -- I -- I don't know. I mean, she's just a woman who's just not going to do anything. She'll promise. She'll say. But we had meeting after meeting. And she would spin her lies in these joint meetings.

And John -- I asked John a question, John, is that true? And he just said no. And he began to confront Marian. Even with the lies she was saying in these joint meetings, well, John ordinarily was just quiet. He would look through the paperwork, look through the documents, look through the evidence that was against them and Marian would do all the talking.

And finally John was confronting Marian. And Marian said, I'm going to think about it. Then we had another joint meeting because Marian said, well, my plea agreement is different than John's. And we went through the plea agreements page by page by page. They were identical. And she still wouldn't enter the plea. John would speak to her through the

phone or through other communications, you know, try to get her to plea. She wouldn't plea.

The affidavit that -- that John wrote, I believe that that was going to be used for the purposes of pigeonholing John to what his testimony is going to be because the Government understandably is afraid because they see the love that John has for his wife and that he's willing to go to prison for as long as she goes just to keep that love and that fantasy going because, you know, he was willing to almost not even plea to stay with his wife.

So he writes this letter to show the Government this is what I will testify to. I will be honest. I will be forthcoming. And in the back of my mind being a lawyer I knew that Peter would get -- Peter Sartes would get in to Marian. And that still didn't convince Marian to enter a plea.

The efforts that Mr. Morgan made to get his wife to enter a plea was not for the purposes of a 5K, although he's hoping for consideration for that, but it was more out of his own desire to get her to plea, to do the right thing, to spare the victims having to come in and testify, spare the resources that it would take to prosecute a case that's -- that is what it is. I mean, on the face of it you could see it.

But she was constantly putting the screws to John even after she got moved and he got moved and we had no more joint meetings. The screws were constantly being put to him.

And I would come see him, and he sometimes would be in tears and he'd feel very bad, but he was always willing to testify.

When the Government asked me to inquire, would you be willing to testify in their case in chief because the plea agreement only calls for him to be called as a rebuttal witness, and he agreed, yes, I will testify in your case in chief if I'm called. And we met with the agents multiple times to discuss what his testimony would be, what the debrief and do the other things that -- that are necessary.

Uh, you know, it's funny Bowman got a two-level -- you know, a recommendation for a two-level reduction because by the Government's view because of the chronological order, you know, John pled after Bowman. Therefore, Bowman gets credit.

Mr. Bowman had no -- nothing to do at all with John's decision to plea. John decided to plea way before that. We were going to plea, but Marian wouldn't do it with him. And it was when he decided at the end, it's too close, I'm not risking, you know, going to trial, I'm not risking the rest of my life because you won't do it with me is when he finally decided to plea.

I cite from that letter that he wrote, Your Honor. Uh, the Government asked if I would testify on behalf of their case simply for the matter of the, uh --

THE COURT: Voluntariness.

MR. TAGER: Right, for the volunteer. That he wasn't

coerced and everything else.

And, you know, as a lawyer I have to walk a very tight line because I know a lot more of the story and I'm trying not to tell the jury anything more that's going to cause a mistrial or any issues for the Court.

But I had a long conversation with John, and I told John, you can say no, you're free to say no, or you could say yes, but you could refuse to allow me to disclose any attorney/client or work product.

And we had a long discussion about that. And I explained to him the purpose of that is if Mr. Sartes or some reason the Government starts asking questions involving communication between you and I, I can't answer that unless you say yes. All I could talk about is what your demeanor was in court, you know, he didn't look to be coerced and that kind of thing.

But he freely said, no, I waive attorney/client, I waive work product. He even signed the documents that I brought to court that day saying that. So again, he's gone over and above what was required of him by allowing me to testify, by waiving attorney/client and work product.

The things that he has done, I believe, you know, he's done everything he could to get Marian to plea. But just because she doesn't plea, that still should not give him credit for the emotional trauma, the emotional difficulty it was

distancing himself from his wife for 15 years, being at odds with his wife for 15 years to try to get her to do the right thing.

Could I just have one moment, Your Honor?

(Pause.)

Generally at least in my experience I've seen that, you know, most defendants who testify, I usually see four levels or a much larger level of departure under 5K when they actually take the stand and testify. And although Mr. Morgan didn't, he was available and he was willing to and he authorized me to.

And I was even asked on the stand, is John Morgan going to get credit for your testimony? And I answered, well, I assume so. I'm hoping he will because the Government generally gives credit for the defendants when even their lawyers testify.

So to simply give two-level departure under these circumstances, all the stuff that Mr. Morgan has done and, uh, all of his involvement in trying to get his wife to plea, all the assistance, writing an affidavit and agreeing to testify, I would ask the Court to award him more than simply the two levels that the Government is seeking.

THE COURT: Okay.

On this one issue, Ms. Krigsman, do you have any response?

MS. KRIGSMAN: On the 5K1 issue, Your Honor?

THE COURT: Yes.

MS. KRIGSMAN: No, Your Honor.

THE COURT: All right.

I'm going to consider the 5K1 and the variance and anything else together, so why don't you talk to me about the variance that you earlier were going -- I'm sorry.

MS. KRIGSMAN: Oh, I'm sorry, Your Honor.

THE COURT: You were going to talk about the fact that -- and I'm not sure how it's all -- all going to pan out, but the fact that he really is not getting much credit for acceptance.

MR. TAGER: Right.

Judge, because his guidelines right now is by my calculation a level 36, it was a 37, uh, and then he lost the one point on the manager -- on the leader, organizer, it dropped to a level 35, he caps out at 180 months. And because of that he doesn't get any of the credit for acceptance of responsibility.

And the whole public policy argument behind acceptance of responsibility, we want people to plea. We want people to come forward both -- not just to, uh, admit their guilt, but to debrief, tell the Government their involvement, and the Government rewards them, and the guideline sets it up to reward people who accept responsibility for what they've

done. And they reward them with three levels.

However, it does not appear that the guidelines contemplate this type of a situation where the person's guidelines exceeds the statutory maximum, that they should get the acceptance off of the statutory maximum.

Uh, Mr. Morgan has cooperated. He's accepted responsibility. He's debriefed over and over and over again, uh, provided information to the Government.

Uh, however the acceptance of responsibility, Your Honor, he's not really received credit for because of the guidelines range. And for that reason, Your Honor, I'm asking the Court to give him the three levels as a variance under 3553.

Also, Your Honor -- do you want me to make all of my 3553 arguments?

THE COURT: Sure.

MR. TAGER: All right.

Also, Your Honor, uh, the nature and circumstances of the offense and the history and characteristics of Mr. Morgan, uh, he's in his 50s. He doesn't have any prior criminal history prior to this. Uh, and in speaking to people that know him, the letters that Your Honor has received, uh, and I think some of the family members and friends who are going to speak on his behalf, uh, this is not behavior of the John Morgan they know. This is behavior that came later on in his life after

acquaintances and, you know, getting involved with Marian.

I'm not trying to say he's not responsible, because he is responsible. He allowed himself to get involved in something that he shouldn't have been involved with. And as the Court says, he's smart enough to know that. However --

THE COURT: And he got all the benefits, the Maserati and --

MR. TAGER: Oh, yeah.

THE COURT: -- the expensive birthday party and all the other cars and so on.

MR. TAGER: Yes, ma'am. I mean, we're not disputing that. It's --

THE COURT: The expensive houses.

MR. TAGER: As far as Mr. Morgan, though, he has no prior history of anything that's even close to this. He comes from an affluent family, a very close-knit family. His mother's 80 years old. Recently had a hip replacement. His father's 83 years old. They were both pillars of the community. No -- no problems or anything. Very strong ties to the community.

And I'm asking the Court to consider not the person who he was during these last seven years, but the person that he was prior to that time and the person that he's been and will be once he's released from incarceration, Your Honor.

He's not a thief. He's not a con man, although

during that period of time when he was involved with Marian in the multi-level marketing, that -- that's not him. And I can't argue that's strong -- more in behavior because it's longer than just one episode. It's a continuing long episode.

However, again, Your Honor, we look at the circumstances. John's role in this entire thing was he was the person who spoke to the investors, lenders or victims when they initially made contact. Marian's the middle man. Her people would contact people they know, solicit them, hey, we have a good opportunity. You can make 5,000,000,000 times your return every month. They'd give them paperwork and then they'd contact John.

John would speak to them, convince them it's a great deal or whatever his spiel was and then people gave money. John's involvement in this matter was an integral part of this case. There's no disputing that, Your Honor. However, uh, again without Marian's involvement, without the people that set this up, without the people that would go out and do the solicitations, this would not have occurred.

And John's involvement with everybody after the money was initially wired ended. He wasn't the one lulling them, lying to them. And it was Eli and Marian that communicated between them.

John had very few communications with anybody. And for that reason, Your Honor, I'm asking the Court to consider,

uh, the variance both for the acceptance of responsibility as well as the, uh -- who he was prior to this situation as opposed to the situation itself.

THE COURT: Do you have the case that you earlier referenced about acceptance of responsibility and the variance?

MR. TAGER: Just give me one minute to locate it, Your Honor.

(Pause.)

Yes, Your Honor, it's United States versus Rodriguez. Do you have the citation there?

(Pause.)

Your Honor, do you want a copy?

THE COURT: Please.

MR. TAGER: For the record it is 64 Fed.3d 638.

THE COURT: Thank you.

(Pause.)

Thank you.

THE BAILIFF: Yes, ma'am.

THE COURT: Mr. Tager, I should have asked this earlier when I was posing the questions to Ms. Krigsman. Do you or your client have any objection to the forfeiture of any interest that Mr. Morgan might have in the boat?

(Pause.)

MR. TAGER: He has no objection to that, Your Honor.

THE COURT: All right.

What about as to the forfeiture money judgment in the amount of $10,085,375?

(Pause).

MR. TAGER: Judge, the only concern that there was with that was how does that overlap or play with the, uh, restitution?

THE COURT: It doesn't. Forfeiture is punishment. Restitution is an attempt to get money back to the victims.

(Pause.)

MR. TAGER: He has no objection, Your Honor.

THE COURT: All right.

The restitution, Mr. Tager, I have been handed something that I have not at this point read, but it seems to be two sheets. I'm going to refer to the one that has a number of columns on it which indicates the victim, where the victim lives, the amount of restitution owed to that victim. There are a number of victims. I think a total of what, 90?

MS. KRIGSMAN: There are 87, Your Honor.

THE COURT: Okay, 87.

87 victims. And the total amount of the restitution is $17,360,850.

Have you had an opportunity to look at this list and do you have any objections either to the individuals or the total amount of restitution?

MR. TAGER: Your Honor, we have gone over this. I

provided Mr. Morgan with a copy of it this morning. We've been reviewing it. We have no objection to it.

THE COURT: Okay.

A number of the victims did testify at the trial, but certainly not all of these victims.

(Pause.)

And let me just make sure I understand. You anticipate that this restitution will be increased; is that correct?

MS. KRIGSMAN: Your Honor, the figure will not be increased, but we will have a more specific breakout of victim number 87, which is now listed as BMG victim --

THE COURT: Oh, okay. So you've just included the restitution as a whole, but you don't know to whom?

MS. KRIGSMAN: That's correct. That's the part we're still figuring out.

THE COURT: Okay. Thank you.

All right. Do you have victims in the courtroom?

MS. KRIGSMAN: Your Honor, uh, we have one victim, Mr. John Long.

THE COURT: Okay.

Does he wish to be heard?

MS. KRIGSMAN: Yes, he does, Your Honor.

THE COURT: Okay. Thank you. I'm just trying to figure out what we have here.

Mr. Tager, you had indicated earlier that you felt that some family members wished to be heard.

MR. TAGER: I have one family member and one friend.

THE COURT: Okay.

Why don't you go ahead and call them then.

MR. TAGER: Your Honor, I'd like to call Ms. Morgan.

No, she's just going to read a statement and then she would just like to also address the Court.

THE COURT: Is this his mother?

MR. TAGER: Yes, ma'am.

THE COURT: All right.

If you'll stand at the podium. Thank you.

Let me ask if you will begin by stating your name.

MRS. MORGAN: Rita Morgan. I'm his mother. And this is, uh, his father, Lesley Morgan.

THE COURT: Okay. Go ahead.

MRS. MORGAN: Uh, Your Honor, unfortunately I couldn't hear everything that was going on and neither could he, so I might not say something that went along with that.

THE COURT: That's fine. Just go ahead.

MRS. MORGAN: All of our family just is at a loss without John. We just love him so. And he, uh, has been greatly missed for two-and-a-half years. He's so kind and loving and he's always provided a lot of joy for us. He's thoughtful and considerate of others, always optimistic and

expecting the best.

Now, I'll get down to business. Uh, his friends will tell you that he has never been known to cheat or be dishonest in any way. They tried to point out to him that he was being led into a tangle of transactions that were complicated and -- too complicated to be properly understood even by someone who's knowledgable in financial matters.

And I do know that somewhere along this process it -- I had the understanding and I think John did too that this money was going to be given back. That, you know, the whole thing was, uh, to make money. And he understood that they were eventually going to get it back, which was the whole idea from the beginning.

Uh, John's brother is very sad, very sorry that he couldn't be here today. And he did write a letter. And, uh, so he says, I'm writing this letter to express to you my opinion of my brother and how he ended up in this current situation.

John is a very intelligent individual and so forth and so forth. He has always been kind and considerate and someone who treated all people with equal respect regardless of their position in life.

He has always been the sibling in our family who remembers birthdays, anniversaries and special occasions. And I always thought that John would be the one to take care of me

when I got in my 80s, which I am 80 now and his dad is 83. And I knew that John would take care of me, and so I want him to get where he can.

Let's see now.

The -- he's always been -- okay.

With John's knack for adventure, the thrill of the ride was something that attracted him. Uh, approximately 15 years ago my brother met Marian Debaugh who later became his wife. She offered a thrilling lifestyle that attracted him.

In turn I believe John offered stability, American citizenship and credibility to her business as well as an educated husband who was professional in appearance and demeanor.

I do not believe John could orchestrate the scheme that is currently in question. Unfortunately he was along for the ride.

Uh, John is not a threat to society. I think he will find a way to be a productive member of society if given the opportunity. It would be so meaningful to our entire family to have John back in our lives. I appreciate your consideration of John's positive attributes as you determine his sentence.

And we -- our whole family loves John, and, uh, with him growing up -- I just know that he would not do anything to hurt other people.

I know one specific instance was when he was, uh,

young and he was working in a used car place. And somebody wanted to buy a very expensive car that they couldn't -- they could not afford. And John, uh, took them to look at some cars that they could afford and talked them out of buying the big car because he -- he didn't want to see somebody get in that position. And that's John's attitude and his personality.

And, uh, we just can't see how he could have gotten involved in all this. We know that he got involved in it more than he intended and we know that he did not intend to ever hurt anybody.

So that's my -- I'm his mother and I love him and I just can't wait to have him home again.

Thank you.

THE COURT: Thank you.(11:09 a.m.)

MR. TAGER: Your Honor, next is Will Bowen who would also just like to speak on behalf of Mr. Morgan.

THE COURT: Yes.

Sir, if you'll come up, and if you'll state your name and tell me your relationship with Mr. Morgan.

MR. BOWEN: Yes. My name is William Bowen, and I've known John for 45 years. I was his best friend growing up right -- he lived right down the street from me. I currently teach school -- middle school. I've taken a day off to come down here and be here at these proceedings.

Uh, I just want to say that, uh, I've known John

longer than anybody else other than -- outside of his family. He was my roommate during high school. We both went off to school together.

And, uh, I have kept in touch with him, uh, throughout the last, you know, uh, years after -- after we both graduated from high school. He went to a different college, but we continued to see each other and communicate.

And I've known him before Marian and post Marian, and I kind of have those two dates in mind because it was a different person, not a different person, but things were going on. And I, uh, noticed that John's whole, uh, lifestyle changed after he met Marian, and I think that was enticing to them. You know, he liked fast cars and fast boats and that was a opportunity for him.

And, uh, I know for a fact, uh, that John could not have orchestrated this because John was never a leader. The whole time we were growing up, he always went along and did what we did. He was kind of only doing his own deal. He was a body builder and stuff. But he would never orchestrate such a tangled web of deceit.

And, uh, I believe that he realistically thought he was making money in a -- in a way that, uh, everybody was going to be okay and reimbursed and it was exciting to him. And I believe when -- when it was broken down to him that -- that there were certain laws that -- that were broken, that he

recognized that and owned it immediately and was -- and -- and pled guilty and did whatever he could to entice Marian into that position because he believed it was the right thing to do.

And I think John, uh, always was a productive member of society and will be after he, uh, gets out of his incarceration. And I look forward to being able to spend time with him again in the future.

He -- he loves my children. He loves people. And, uh, he needs to be out where he can interact with people. And, uh, I just -- I miss him a lot and I just want him to be -- be -- be out of this mess that he's in right now. And that -- that's really all I have to say.

THE COURT: Thank you, sir.

MR. BOWEN: Yes.

THE COURT: Mr. Tager, any -- and Mr. Morgan, I'll hold him until last.

MR. TAGER: Yes, ma'am.

THE COURT: But anybody else?

MR. TAGER: There is nobody else, Your Honor.

THE COURT: Okay.

MR. TAGER: Yes. Thank you.

THE COURT: All right.

Ms. Krigsman, you had indicated that Mr. Long was here?

MS. KRIGSMAN: Yes, he is, Your Honor. May he come

forward?

THE COURT: Sure.

(Pause.)

If you'll come forward, sir, and stand at the podium.

(Pause.)(11:12 a.m.)

And would you begin by stating your name.

MR. LONG: John long.

THE COURT: All right, Mr. Long.

MR. LONG: Well, Mr. Morgan and I have been listening to a number of the comments. Uh, I'm a little confused through this whole process of all the things you didn't know, but I'm confused as to why you didn't ask the question where all this money was coming from. I mean, it just does not tie together from a victim.

Do you recall in November of 19 -- or of 2007 when we had a telephone conversation?

THE DEFENDANT: (Nodding affirmatively).

MR. LONG: And, you know, I -- I -- I continually hear that he knew nothing about this. But at that point you were explaining the trading of all the derivatives, guaranteed me the -- that my investment was safe in an escrow account in the Danske Bank.

(Pause.)

I do have a -- a letter from another of the victims that was e-mailed to me. I picked it up last night.

THE COURT: Okay. Would you like to read it?

MR. LONG: Well, I can read it, but I would, uh --

THE COURT: You want to give it to me?

MR. LONG: Yes, I could give it to you.

THE COURT: All right.

MR. LONG: I mean, it's, you know, the gentleman expressing his disappointment.

THE COURT: Okay. Would you give it to the security officer.

(Pause.)

Thank you.

It's a letter from Jason Marlow and Vern Miller.

Go ahead.

MR. LONG: Okay.

Uh, well, I would like to address the remarks of Mr. Tager who made a statement that, uh, Mr. Morgan is not a thief and he's not a con.

And I was involved in this process for two years. And at one point, uh, that led to our conversation, I challenge that statement completely because Mr. Morgan explained the entire process of these derivatives and their trading sometimes several times a minute. And at the end of the day and by December 10th the foundation was going to have a hundred million dollars. John and Marian Morgan are going to have a hundred million dollars. And we would be doing significant

business in the future.

Uh, so my point being I really challenge the statements that he was unaware, didn't know what was going on. Uh, and from my personal standpoint the fact that even after you're caught, you're indicted, to my knowledge not a single investor has ever heard an apology or any remorse.

The victims are disappointed that you were in the Superseding Indictment named in 22 counts and you pleaded down to two. And from that standpoint we, uh, highly recommend that whatever the maximum is, that is what is assessed.

(Pause.)

In regard to, uh, the, uh, repatriation of money, uh, there's a -- there's a list that from the information I have, and I certainly don't have all the information, uh, but there is a list of about 1,600,000 that we feel has a chance to be tapped into and got back. And so if there is cooperation from Mr. Morgan and his attorney to aid the victims in getting that, we would consider something different in the future.

Uh, and the other one that bothers me personally is when they went -- if I'm reading the plea correctly, that Mr. Morgan has agreed to pay whatever is owed the IRS to drop the tax evasion charges. And from a victim's standpoint, uh, we would like to explain to the Court to me that is just a paper sentence that we feel really has no meaning.

And I -- I -- I sat back there, and, uh, whatever my

comments are, Mr. Morgan, they're for your actions. I don't know Mr. Morgan, but I do know the actions and the lulling that you personally did to me and some other investors that I know.

And I can appreciate the feelings of your 80-year-old mother. I would just like this Court and your mother to know, uh, there's an 80-year-old widow, Valerie Melnikoff that this group talked into investing money.

Valerie had significant health problems. She did not have the resources to get the medical attention she needed. And your group took her money, told her that within three months she would have all the money she needed to get her care. And that is absolutely despicable.

Uh, and so I -- I guess I close. I just want to emphasize that to the Court that there's just no way from the vantage point that I had that Mr. Morgan wouldn't have known what was going on.

THE COURT: I agree.

MR. LONG: And I guess all that -- I want to leave it with, you know, one of the old statements, when you slow dance with the devil, it can be hazardous to your freedom.

THE COURT: Thank you, sir.

Ms. Krigsman, anyone else?

MS. KRIGSMAN: No, Your Honor.

THE COURT: All right.

All right. Mr. Morgan, is there anything you'd like

to say?

THE DEFENDANT: Yes, there is.

THE COURT: All right. You can stand at the podium.

THE DEFENDANT: Your Honor, thank you for the opportunity to speak this morning.

And I also want to thank my family and my friends for coming this morning. It's been a while since I've seen them and I appreciate their support.

Uh, the first thing I'd like to say starting out is -- is to address the victims of this crime. First of all, for all of those victims out there who have suffered a loss here, uh, I am truly sorry for the losses they have incurred and for the damage that it's done to their families because I know that with any loss like this there is -- is a lot of tertiary damage, multiplier effect of other people that are affected. So I want to apologize to them directly and, uh, I'm very sorry for their losses.

I also want to apologize to some of the people that were in our close network of friends that introduced us to their contacts and put their reputation on the line to introduce them to us. While they may not have had personal funds invested or they may have, but I apologize to them as well for damage that's been done to their reputation through their affiliation with us.

Uh, many of these people are people that either I or

Marian have known for 10 or 15 years, 20 years, long, long-standing relationships who called people and said that, you know, they state their credibility on John and Marian because they believe John and Marian are good people. So I want to apologize to them for the damage that's been done to them and their reputation and to their families.

Uh, I want to let these victims know that we did not start this business with the intention of causing a monetary loss to anyone. I would -- I would never do that. I wouldn't start something for that specific purpose.

We got into this with the intention of -- of producing good results for people. And I'm not here to try this case again or to justify my actions. I'm here to accept responsibility for my decisions. And I accept responsibility for my results, but we were in the middle too. We were led by people, uh, acting as brokers and claiming that they were traders and, uh, you know, painting rainbows in the sky for us as to what they could accomplish and what they could achieve.

And to my amazement there are dozens of these kinds of people claiming to be traders all over the world because we -- we went to meet them in Europe and in Asia and Hong Kong and Thailand and all over the world. And it's amazing to me how this business model is endemic out there and how believable it is and how they -- how they talk with such knowledge.

And there again, I'm not justifying my own actions

because I accept responsibility for following their lead and being a part of what they were -- what they were campaigning.

We also had people presenting financial documents to us claiming that they were in control of large assets that we could put into these programs for trade. And those were also false. And so standing in the middle of between what is zero on one hand and zero on the other hand only amounts to zero.

And the further we went along and I realized that this was out of control, I began to realize we were not going to be able to produce the results that had been told to us and that we had told to other people about.

And a lot of the information that we shared with people on e-mails and over the phone was information that I was -- that I was told. And, uh, so I personally suffered from a lack of due diligence of what we were getting involved in and also a lack of discernment on the kinds of people that we were relying on and their promises. And there was a lot that I needed to do to look into what I was getting myself involved in.

And my failure to do that is, uh -- is why I'm here today, is why I stood up in May and I said, you know what, what I did was wrong. And I tried to convince my wife Marian to stand with me. I told her, I said, we need to do this together. And the reason we need to do this together is so that we can be together again in the future.

You know, we -- we have a debt to society to pay and we have restitution that needs to be paid. And, uh, I did everything I could to get her to -- to plead guilty, to recognize that what we had done was wrong.

You know, I've -- I've lived an honorable life to this point, Your Honor. I think my friends and my family have -- have attested to that. And the last six, seven years has -- has been a huge mistake. It's been a huge error on my part and I'm aware of that.

And I just want to ask the Court that the sentence I receive today while it will allow me to pay my debt to society, I want to be able to show these investors that I want to help them see a better day too. And I hope that with the sentence I receive I will still have time to get out and be productive and to pay some restitution and to show them how much they mean to me and, uh, how sorry I am.

So I appreciate Mr. Long coming all the way from Colorado. I understand he lives in Colorado. I appreciate him coming and speaking on behalf of all the victims. And just like there are a lot of people that would like to be where he is and speaking about their frustration and the damage that's been caused to them, I wish they were all here to hear me apologize.

(Pause.)

I just want to ask the Court to be fair. I've tried

to do the right thing.

Thank you, Your Honor. I appreciate the chance to speak.

THE COURT: When did you try to do the right thing? You mean by pleading?

THE DEFENDANT: By recognizing that what I had done is wrong. Exactly.

THE COURT: Well, I'm not --

THE DEFENDANT: And I want to --

THE COURT: -- really sure you have recognized it completely, so let me just ask a couple of questions.

THE DEFENDANT: Okay.

THE COURT: Have you had any kind of job in the past five or six years?

THE DEFENDANT: The last job I had was in Chicago. Uh, I worked for one of the exchange member firms. It was not in the last five or six years.

THE COURT: Okay. And --

THE DEFENDANT: No. To answer your question, Your Honor, no.

THE COURT: And how did you live? How did you support yourself in the past five or six years?

THE DEFENDANT: In the past five or six years it was -- it was, uh, through the investors' funds.

THE COURT: And those are the same funds that were

supposed to be in escrow and were not supposed to be taken out of escrow?

THE DEFENDANT: That's correct.

THE COURT: And that's what you used to travel around and meet everyone? And that's what you used to buy the car that you drove? That's what you used to pay for the house that you lived in, the food that you ate, everything else you did?

THE DEFENDANT: That's correct.

THE COURT: Didn't that occur to you that that was wrong?

THE DEFENDANT: Yes, it did.

THE COURT: I mean, that took place over a number of years. You had a number of years to recognize the fact that that was wrong, correct?

THE DEFENDANT: Hum-hum. (Nodding affirmatively).

THE COURT: Okay.

You said that you expected this to make money. You didn't go into this with the idea that you wouldn't make money. You didn't invest any of these funds, did you?

THE DEFENDANT: They weren't required to be invested from the standpoint of how we were going to generate profits. These funds were going to enable us to pursue the contracts that we needed with the other, uh, block of funds that an investor claimed he was representing and with the traders. We went and met all these people in person, uh, to try to ensure

that we were going to achieve results.

THE COURT: Okay. Other than meeting with people, did you do anything else?

THE DEFENDANT: Well, we did a lot of documentation and paperwork and things like that. I'm not sure I understand what you mean by "anything else."

THE COURT: Well, I'm just puzzled as to how these people were going to make any money. You seem to be convinced that there was something going on that there was -- they were going to make money. How is it that they were going to make any money, your investors?

THE DEFENDANT: They were going to be paid as -- as part of the yield produced from private placements from our larger investor.

THE COURT: Did you ever do any private placements?

THE DEFENDANT: We attempted to many, many times.

THE COURT: Did you ever do any private placements as you call them?

THE DEFENDANT: We thought we did. We had active contracts to be paid on.

THE COURT: Did you ever get paid on any of those contracts?

THE DEFENDANT: No, we didn't. It was a -- it was a mirage in the desert. I told -- I explained to these investors they were going -- their funds were essentially -- went to

piggyback a larger investor, you know. They knew that because of the minimum amounts that were supposed to be required of a hundred million to get into a program like this, that there was going to be a large block of assets that was going to get us into trade and that they were going to be paid from the yield that those programs produced.

THE COURT: But those programs never produced any yield?

THE DEFENDANT: Didn't produce any yield.

THE COURT: And the only way you paid any investors was when you took other investors' money and paid them?

THE DEFENDANT: Hum-hum. In fact, these programs don't exist. And I'm -- as I said, I'm stunned, I'm amazed that so many people worldwide talk about high yield private placements, bank debenture trades, medium-term notes, all this verbiage that, uh, comes out sounding very sophisticated, but there's nothing behind it. There is not a market that trades in the way that they say these -- these programs trade.

THE COURT: And when did you recognize that? How long did it take you to figure that out?

THE DEFENDANT: Uh, it took me about three years to recognize that because believe it or not, people that were saying they were brokers or traders kept introducing me to somebody who was higher up who was a trader and sending us on a wild goose chase, but yet always saying that, well, this world

is very secretive and it's very, uh, elitist and, uh, you'll never actually meet the real trader, you know. And so they always kind of held one step away from, you know, actually achieving it or seeing it.

THE COURT: So in the meantime you lived by taking the money out of the investor funds?

THE DEFENDANT: Correct.

THE COURT: Okay.

All right. Thank you.

THE DEFENDANT: Thank you, Your Honor.

THE COURT: All right. Ms. Krigsman, do you have anything else?

MS. KRIGSMAN: Your Honor, I'd like to argue the issue of the variance on acceptance of responsibility. And, uh, after that do you want me to proceed with my sentencing remarks and my --

THE COURT: Yes, please.

MS. KRIGSMAN: Okay.

Your Honor, may I --

THE COURT: Yes.

(Pause.)

MS. KRIGSMAN: Mr. Long actually helped me unwittingly to argue my -- my case on the fact that Mr. Morgan should not be entitled to a variance for -- based on Rodriguez and the fact that his plea -- that he will get no, uh, real

benefit for acceptance of responsibility because Mr. Long mentioned the fact, uh, as, uh, is clear from the record that Mr. Morgan was given the benefit of a very generous plea agreement, that being he was allowed to plead guilty to two counts instead of, uh, the 22 counts that were in the Superseding Indictment.

Those 22 counts carry a total statutory maximum penalty of 264 years. If Mr. Morgan had not pleaded guilty to the plea agreement, uh, and we add the three levels, uh -- you determined earlier that the -- the total offense level was 36. And if we add back in three levels, uh, for the acceptance of responsibility, that takes him to a level 39, which yields a sentence of 262 to 327 months. That's what he'd be looking at but for the benefit of the plea agreement.

Now, that is relevant because the case that Mr. Tager refers you to, Rodriguez, does suggest that in some cases a variance may be appropriate when a defendant pleads guilty. And then the statutory maximum, uh, prevents the guideline range from being imposed. And essentially the defendant gets no, uh -- no benefit for the acceptance of responsibility.

But there's a key factual distinction with Rodriguez, Your Honor. And that is in that case the defendant was charged with two counts. He pleaded to the two counts. There was no plea agreement.

They already gave him a benefit and already

acknowledged his acceptance of responsibility. He -- that was a defendant who absolutely got no benefit whatsoever to pleading. Here Mr. Morgan has received a huge benefit from that plea agreement and Rodriguez does not apply.

And I would also argue, Your Honor, that his statements here to you today cut against any variance for acceptance of responsibility because he still has not faced the music on what he did to these victims. He's still perpetrating the lie.

We heard from Mr. Morgan that there were other people to blame. That he and Mrs. Morgan, they were in the middle. That there were traders out there. And he was surprised at how popular this business model is.

Well, we know who got all the money. And no traders got money and no other businessmen out there in the world -- in the various parts of the world they traveled to got the money. He got the money. So for him to stand here and tell you that he and his wife were -- you know, they were somehow victims too, that flies in the face of any variance whatsoever for acceptance of responsibility.

And I'd also like to comment on some of the other information we've heard today in the plea agreement -- in the courtroom, Your Honor.

You know, Your Honor, right before this sentencing today Your Honor had a young defendant before you. And like

many other defendants who appear before you, it appeared that that particular individual probably didn't have a fancy education.

Mr. Morgan went to boarding school. He has a Master's degree and he had two semesters of law school. His family spoke to you today, and it's clear he has a loving and devoted family. Other defendants who appear before you don't have the benefit of an education or family support and in many cases their resources are limited.

This is a man who had every advantage. He had the smarts. He had the education. He had a family. He wasn't desperate to commit a crime. He committed it because he was greedy and because he was lazy. He didn't want to work for a living.

One of the other things that Mr. Morgan said today that quite frankly shocked me was when he said, we didn't start out on this scheme with the intent to deprive anybody of money.

You know from the evidence at the trial that he and his wife started out this scheme to make up for the losses they had suffered in that crazy cargo scheme that they had been a part of. They owed people money. And this brand new MEH scheme was a way to find that money. So from the very get-go this was a fraud and he knows it and you know it. He is not a victim.

And Your Honor, we've also obtained information that

Mr. Morgan and Mrs. Morgan plan on writing a book where they will tell all their MEH people just how hard they worked for them. And they can't wait for the book to come out. So that shows you that there's absolutely minimal acceptance of responsibility here.

There's enough acceptance for him to get a benefit of a plea agreement and to get a 5K and no more.

Your Honor, you've seen the facts in the plea agreement, you've seen the PSR and you've presided over the trial of Marian Morgan. And I don't need to go over the facts of the -- this massive investment scheme that affected victims like Mr. Long.

And as I said at the trial, this scheme for all the middle men and for all the business models, it boiled down to fancy stealing. And John Morgan does stand here today a convicted fraudster and a thief. And this case is about more than just John Morgan, however, it's about the victims.

Now, in addition to John Long who we had the opportunity to hear testify at trial, and Mr. Long mentioned an 80-year-old widow, Ms. Melnikoff. There was another 80-year-old widow you heard about at trial, and that was Leta Daniels. And her story as a victim of this crime is not only compelling because of the personal background that she has a granddaughter who was born with severe cerebral palsy and she was trying to grow her nest egg to be able to take care of that

great granddaughter, but also from the timing aspect of it.

Ms. Daniels was one of the last investors in MEH. From July to September 2008 she invested her $100,000 nest egg with John and Marian Morgan. And by that time even if you credit John Morgan's wobbly version of events, he certainly knew by then that the whole thing was a fraud. But he and his wife nevertheless took that $100,000.

When their money was drying up, their list of victims was dwindling. And what did the evidence at trial show -- show that they used that money for? Well, they used the first $50,000 to pay their mortgage on the fancy mansion down on the water in Sarasota and the adjoining lot. And they used the second $50,000 to underwrite their continuing extravagant lifestyle. Your Honor, society needs a long break from Mr. Morgan.

Now, and based on how the statutory maximum works to create the sentencing guideline range, Your Honor, I don't know where Your Honor is going to begin. Uh --

THE COURT: Well, if -- prior to any departures it would seem to me that he's -- he's -- it's a 36, one, but the maximum penalty is 180 months, so that would really put it in the next guideline range.

MR. TAGER: Your Honor, I thought it was -- I'm sorry.

MS. KRIGSMAN: So you would be looking at a total

offense level of 35 then, Your Honor?

THE COURT: Well, it's a 30 -- no, it's -- I mean, guideline wise it's a 36, but the maximum penalty is 180 months.

MS. KRIGSMAN: Right. And -- and that, uh --

THE COURT: Are you asking me where I'm going to depart from?

MS. KRIGSMAN: Yes, Your Honor.

THE COURT: Yes. Okay. I would think that I would have to depart from the -- well, it's a departure from the guideline range, so that's where I would consider departing from. So that would mean from the 36.

MR. TAGER: Your Honor, I think that the departure has to come off of the statutory maximum, of the 15 years. And my suggestion to the Court is that, uh, he receive the offense level equivalent to that sentencing range of the 180 months, which I would argue would be a level 34. And departure should come off of that. And the reason -- it's either level 34 or level 35, because they both incorporate that number of months, 180 months.

However, I would argue it's a base level 34 because pursuant to the plea agreement for one thing there was agreed to low end of the guidelines. And although the guidelines aren't applying now because it's, uh, the statutory maximum working off of, uh, however, that -- because again that is part

of what the plea agreement was.

Additionally, I kind of equate this like the rule of lenity. If you have a rule that can be applied either way, or if you have guidelines that predate or that are older than the Sentencing Guidelines, you use whichever ones are in the defendant's favor. And for that reason I would argue that it should begin at a base level of 34 and then the departures or variances come off of that.

THE COURT: All right.

Well, Ms. Krigsman, you filed the motion. And the motion itself, all it says is a two-level departure.

MS. KRIGSMAN: That's correct, Your Honor. And should I -- well, then should I wait to give a specific recommendation?

THE COURT: Yes. Why don't -- no. Why don't you go ahead and do that.

MS. KRIGSMAN: Yes, Your Honor.

THE COURT: No, go ahead.

MS. KRIGSMAN: Oh, sorry.

Well, if Your Honor begins from -- as Mr. -- well, I think our -- our recommendation then would be we would look at, uh, the guideline range of 151 to 188. And this is how I came to my decision. We would look at the guideline range of 151 to 188 and we would take -- assuming Your Honor grants the 5K1 motion for two levels, that would take it down to a total

offense level of 32.

And, uh -- but if we look at where -- the 180 comes in the middle of that range of 151 to 188, so it's a minus eight months from the high end. So if we look at total offense level 32 and we take eight months off the high end of that, it's 143 months.

THE COURT: Okay.

MS. KRIGSMAN: So it's more or less, Your Honor, a strict two-level reduction from wherever Your Honor starts.

THE COURT: All right. Thank you.

All right. Mr. Tager, anything?

(Pause.)

MR. TAGER: No, Your Honor. I've laid out my argument as to what the base level should be. Again, I'm requesting the additional variance Rule 5K based upon everything Mr. Morgan has cooperated with. And as far as some of the comments of --

THE COURT: No. Well, why don't I -- I'm really interested in -- in what type of sentence you think is appropriate here.

MR. TAGER: Your Honor, I would ask for, uh -- if we're at the base level of 34, Your Honor, I would ask for the five-level reduction for everything that he's done, all the cooperation he's provided. Uh, so that would bring us to the 97 to 121 range.

THE COURT: Okay.

MR. TAGER: As far as the Government's argument about that he shouldn't have received acceptance of responsibility, Your Honor, his talking about other people involvement is exactly where all of these debriefings have been involved with. Mr. Morgan -- there are many people involved in this scheme. And it isn't just Mr. Morgan and Marian Morgan that first created this scheme. I mean, Ponzi schemes have been around forever.

For instance, Bo Diamond, who was tried I think in front of Judge Moody, I think he had a $25,000,000 loss amount of multiple victims. He went to trial and received 15-and-a-half years is what I believe the sentence was. I'm not privy to the PSR in his case, so I can't tell you whether he got upwards or downward variances.

However, Mr. Morgan did accept responsibility. Uh, and it is tragic what has happened with these victims. I don't think there's any issue that Mr. Morgan is regretful for what he has caused here.

But him saying that there are other people involved is not taking away responsibility from what he has done. And I don't want to make it sound as though my arguments to the Court as to what Mr. Morgan knew or didn't know and what he did and didn't do, we're not trying to say that he wasn't involved in this. I mean, he was clearly involved in this.

One of the reasons Mr. Morgan really wanted his wife to also, uh, plea and cooperate was because she has more names, more contacts, more of the information that would probably benefit the Government. She dealt with a lot more people that John did not deal with.

Uh, there's Sam Bichet -- there's people that are involved in this that she is more familiar with, can give more of the information to.

And I'm only telling the Court that because of the Government's argument well, he shouldn't get the acceptance because now it doesn't even sound like he's accepting responsibility and, uh, you know, that's something that should be on the guidelines.

The truth is, Judge, when we put together the plea agreement, everybody knew he was going to guideline way above what the statutory maximum was. I mean, there was no question about that. But yet the Government still put in, well, you'll get credit for the acceptance of responsibility and the other things.

You know, you're looking at a loss amount, you know, $45,000,000, $17,000,000 in loss, you're clearly going over the guidelines, but yet they still offered to him the acceptance of responsibility.

And yes, he received the benefit by pleading of the tax charges and the other charges and the potential sentence

there, but that still doesn't take away from the fact that he did accept responsibility. He could have pled open and -- and, you know, cooperated or taken his chances that way, but he pled, he cooperated. And for that, Your Honor, I'm asking the Court to give him those variances.

THE COURT: Well, that wouldn't have been real smart for him to have pled open because then he would have pled to all of the counts, and --

MR. TAGER: Right.

THE COURT: -- then the statutory maximum would have been way up there.

MR. TAGER: Right. Well, I'm saying if there was no agreement -- well, I mean, most of these things -- I understand what the Court's saying. I mean, there were other options to go. The delay in the pleading was the -- was on account of him trying to bring Marian into this because that would have benefited both, and he wanted to just try to help her along as well.

But that would be my -- my request, Your Honor, down to a base level 30 or 29.

THE COURT: Okay. Thank you.

All right. If you'll come forward, I'm going to impose sentence up here.

(Pause.)(11:52 a.m.)

I have to tell you, Mr. Morgan, it did not seem to me

that you were really accepting responsibility either today. You know, I will tell you that your actions by pleading guilty certainly demonstrated that. The fact that you agreed to cooperate, the fact that you signed the affidavit, the fact that you had no objection to your attorney testifying regarding the voluntariness of your plea, all of those indicated you accepted responsibility, but today unfortunately I didn't think that you did.

And, you know, I'm not sure if I were looking at someone that was very unsophisticated and perhaps was uneducated, although the scheme probably wouldn't have worked then, then maybe I might have a little more sympathy for you.

But for three or four years where you traveled around and you used your investors' money and you lived extravagantly, to say that you had anticipated that you were going to pay them all back, I mean, you know, that's a pie in the sky.

These people are out this money and these people are never going to get their money back in all honesty. You might pay -- be able to pay a little bit of the money back, but they're never going to get their money back. The money is gone, at least most of it, perhaps all of it.

At any rate, I'm going to grant the Government's motion pursuant to 5K1.1, the motion that they filed also pursuant to 3553(e), and they have suggested two levels. I'm going to depart another level.

And I will tell you that I realize that it was difficult probably for you to enter the plea, and you certainly at the point that you entered the plea and thereafter cooperated. And the fact that as I said before, that you had no objection to Mr. Tager coming in and saying your plea was voluntary, the fact that I'm sure it was very difficult to plead guilty when your wife pled not guilty and continued to go to trial -- and I certainly heard Ms. Morgan for about three or four days testify, so I know how difficult that was for you.

So for all of those reasons, even though it was in this same case as opposed to a different case, I think a three-level departure is appropriate. And then the question becomes what does that mean and what kind of sentence is that?

If I start as we talked about at a level 35 and go downward three levels, that would put it down to a -- that would put it down to what, a 32. And then the range of imprisonment is anywhere from 121 to 151 months.

Ms. Krigsman suggests that you should not receive the low end sentence because of the fact that there was a statutory maximum and where we started out with the 180 months. I'm going to sentence you to a term in the Bureau of Prisons of 121 months.

Now, that will be the sentence that I impose. I will also order restitution. I made my comments about restitution. And I'll enter the money forfeiture, which you did not object

to.

And another reason for the three-level departure and another reason for me sentencing you at the low -- well, the reason sentencing at the low end of the guidelines, you've been very cooperative about your agreement to the amount of restitution and agreement to the forfeiture. And so that's a reason that I think a low end guideline sentence is appropriate.

Mr. Morgan, on June the 15th, 2011 you entered a plea of guilty to Count One and Count 16 of a Superseding Indictment. Count One charged you with a conspiracy to defraud the United States. Actually it was a three-prong conspiracy. And Count 16 charged you with money laundering. I accepted that plea and adjudicated you guilty.

You told me you have been over the Presentence Report. I too have read the Presentence Report. There were several objections which I have ruled on. And I will adopt the facts and the guideline calculations that are contained in the Presentence Investigation Report.

Prior to any departure, the total offense level I think we've determined is a 36 because we had a three-level increase for your role in the offense and not a four-level increase.

A 36, criminal history category of I. And the range under that imprisonment would still be 180 months, and one to

three years of supervised release.

The restitution in this matter has been determined -- and I'm trying to read off the restitution list in case it's different -- is $17,360,850.

There is a fine range. It's 20,000 to 34,855,700. And I'll be waiving the fine because of the large amount of restitution.

And there is a $200 special assessment.

Mr. Tager, is there any legal reason why I shouldn't proceed with sentencing?

MR. TAGER: No, Your Honor.

THE COURT: Ms. Krigsman?

MS. KRIGSMAN: No, Your Honor.

Would Your Honor like me to break out the joint and several liability --

THE COURT: Yes. In just a minute I will.

MS. KRIGSMAN: Okay.

THE COURT: The Court having asked why judgment should not now be pronounced, and no cause being shown to the contrary, having considered the advisory guidelines, having considered everything that was said this morning, having considered the fact that I presided over the trial of Marian Morgan and also having considered the fact that you pled pursuant to a plea agreement and considered Title 18, United States Code, Section 3553 as far as a sentence that's

sufficient but not greater than necessary, and finally considering the victims in this case, it is the judgment of this Court that you be sentenced to a total of 121 months in the Bureau of Prisons.

Now, I'm going to have to break that out. So I'll break it out as follows:

The maximum on Count 16 is 10 years; is that correct?

THE PROBATION OFFICER: That's correct, Your Honor.

THE COURT: Okay.

So I'm going to impose a sentence of 60 months as to Count One and a term of 61 months as to Count 16 to run consecutive, so that should come out to 121 months.

Following the sentence I'm going to place you on a term of supervised release for three years. It will be concurrent as to Counts One and 16. You'll have to comply with the standard conditions adopted by the Middle District of Florida.

Now, there's a large amount of restitution, so a lot of things go along with that. You can't incur any new credit charges or open any additional lines of credit or buy anything substantial without the approval of the Probation Office. You'll have to provide the probation officer with access to financial information. You will refrain from engaging in any kind of employment that involves the investment industry.

You'll have to cooperate in the collection of DNA by

the Probation Office and submit to random drug testing not to exceed 104 tests per year.

The restitution. I am going to order restitution in the amount of $17,427,850 to the victims that are detailed in the schedule that the Government has provided me. And the schedule that I have, as I understand it, consists of a total of 87 victims. The BMG victims will be broken out at a later time. So the $3,113,000 will subsequently be broken out between the individual victims in the BMG series, right?

MS. KRIGSMAN: Yes, Your Honor.

THE COURT: Okay.

MS. KRIGSMAN: Your Honor, if I may note, there is a slight variance as we tinker with the restitution amount between Mr. Tremmel's final PSR and the actual number that we came up with. The actual number that we have is the most accurate number, $17,360,850.

THE COURT: Yes.

MS. KRIGSMAN: I think that's slightly different.

THE COURT: Yes. Okay. I thought I was using yours. I thought I said that. $17,360,850?

MS. KRIGSMAN: Yes, Your Honor.

THE COURT: Okay.

And it is to be paid joint and several with Marian Morgan --

MS. KRIGSMAN: That's correct, Your Honor.

THE COURT: -- Eli Heckscher?

MS. KRIGSMAN: Correct.

THE COURT: Okay. And how am I doing Stephen Bowman?

MS. KRIGSMAN: He would -- for purposes of John Morgan's judgment he would be joint and several with Steve Bowman for an amount of 3,113,000.

THE COURT: Okay. And then it will be joint and several for the entire amount with Marian Morgan and Eli Heckscher. And it will be joint and several in -- with all of them plus Stephen Bowman in the amount of 3,113,000, correct?

MS. KRIGSMAN: That's correct.

THE COURT: All right.

Because there's such a large amount of restitution, you'll have to contribute while you're incarcerated. If you get a Unicor job or some kind of job that you can earn some money at, you'll have to pay 50 percent of whatever you earn toward the restitution. If you don't get any of that -- that kind of a job -- and it varies I think depending on the prison facility -- it will be $25 quarterly.

Upon release we'll reexamine your ability to pay, and you'll start out paying no less than $100 a month. And then depending on your job, I'm sure it will go up.

I will waive the fine finding that you don't have the ability to pay a fine. You have a court appointed attorney and

you have a large amount of restitution.

I will order that you forfeit any interest that you have in the power boat and also enter a forfeiture money judgment in the amount of $10,883,767 and assess the $200 special assessment, which is due and payable immediately.

The court has adopted -- or will adopt and accept the plea agreement.

And Ms. Krigsman, I believe that you agreed to dismiss a number of counts in return for his pleading guilty to Counts One and 16.

MS. KRIGSMAN: That's correct, Your Honor, all the remaining counts in the Superseding Indictment.

THE COURT: Okay.

And as to Mr. John Morgan, I will dismiss Counts Two through 15, Counts 17 through 22 and the underlying Indictment as well.

The Court having pronounced sentence, Ms. Krigsman, do you have any objection to the sentence or the manner in which it was imposed?

MS. KRIGSMAN: No, Your Honor.

THE COURT: Okay.

And Mr. Tager, do you have any objections other than those you might have already made to the sentence or the manner in which it was imposed?

MR. TAGER: No, Your Honor. Thank you.

THE COURT: All right.

I'm going to remand you back to the custody of the Marshal.

Do you have any recommendations?

(Pause.)

MR. TAGER: I'd like a recommendation for Alabama.

THE DEFENDANT: At Talladega.

THE COURT: Talladega? Okay. I'll make that recommendation. It's only a recommendation and nothing more.

MR. TAGER: Your Honor, I have a strange request. Would the Court consider allowing Mr. Morgan to self-report to the prison or to be furloughed or --

THE COURT: No.

MR. TAGER: -- received on his own recognizance for a few days?

THE COURT: No.

MR. TAGER: All right.

THE COURT: All right. Thank you.

MR. TAGER: Thank you, Your Honor.

(Thereupon, the hearing was concluded at 12:05 p.m.)

STATE OF FLORIDA )

COUNTY OF HILLSBOROUGH )

I, PAUL K. SPANGLER, Official Court Reporter for the United States District Court, Middle District, Tampa Division,

DO HEREBY CERTIFY, that I was authorized to and did, through use of Computer Aided Transcription, report in shorthand the proceedings and evidence in the above-styled cause, as stated in the caption hereto, and that the foregoing pages numbered 1 to 87, inclusive, constitute a true and correct transcription of my shorthand report of said proceedings and evidence.

IN WITNESS WHEREOF I have hereunto set my hand in the City of Tampa, County of Hillsborough, State of Florida, this 5th day of April, 2012.

S/PAUL K. SPANGLER

PAUL K. SPANGLER, Official Court Reporter